MILLER *v.* TOLES.

1. PHYSICIANS AND SURGEONS — AMPUTATION—MALPRACTICE—NEG-
LIGENCE—METHOD OF TREATMENT.

Plaintiff was injured in falling from a scaffold. After being
treated for a sprain by another physician and after con-
sulting two medical practitioners who tried various
methods of treatment, plaintiff's attending physician called
in the defendant to obtain his advice whether amputa-
tion would be necessary. It was determined in consulta-
tion to attempt to save the limb by means of hypodermic
injections, known as the Murphy treatment. The method
of treatment was not generally accepted by physicians but
was undertaken as a last resort to save the foot. The
remedy was one which had in certain instances produced
good results. *Held,* that defendant's inability to save the
limb and the fact that subsequent amputation became
necessary did not render the defendant responsible for
alleged negligence or malpractice.

2. SAME—SKILL REQUIRED.

In the treatment of a broken or diseased limb the contract
implied between surgeon and patient is not to restore it
to its natural condition, but to use that degree of diligence
and skill which is ordinarily possessed by the average of
the members of the profession in similar localities, having
consideration for the state of medical art at the time and
place.[1]

3. SAME—EXPERT OR OPINION EVIDENCE.

The failure of plaintiff to produce any expert or lay wit-
ness who could testify that the course pursued by defend-
ant was improper, or that it in any way contributed to
the loss of plaintiff's foot, the evidence tending further
to prove that the effect or injury complained of might
have resulted from an exploratory operation, which it
was contended that defendant undertook to perform, jus-
tified the trial court in directing a verdict against the
plaintiff and in refusing to permit the jury to draw any
inference of negligent conduct.

[1] The authorities on the question of the degree of care and
skill required of a physician are gathered in a note in 37 L. R. A.
830.

Error to Ingham; Wiest, J. Submitted October 13, 1914. (Docket No. 80.) Decided December 18, 1914.

Case by Charles M. Miller against Louis W. Toles for malpractice. Judgment for defendant on directed verdict. Plaintiff brings error. Affirmed.

*William A. Fraser* and *W. H. Howard* (*E. H. Lyons,* of counsel), for appellant.

*Cummins, Nichols & Rhoads,* for appellee.

BROOKE, J. This is an action for malpractice against defendant, who is a surgeon in active practice in the city of Lansing. The record discloses the following material facts: The plaintiff was injured as the result of a fall from a scaffold on the 24th day of August, 1909. His ankle was badly sprained, and perhaps otherwise injured. He immediately called a physician, Dr. Tooker, who prescribed a liniment which plaintiff applied for some three or four weeks. He later went to Dr. Tooker's office where the ankle was examined, and the injury pronounced to be a bad sprain. The plaintiff continued to use a liniment upon the limb during the fall of 1909 and the winter of 1909-10. He did some work during this period, but found that when he worked the swelling in his ankle would become greater, and when he stopped work it would subside, in some measure. In the spring of 1910 plaintiff consulted Dr. Hagadorn, a physician of Lansing, who made an X-ray photograph of the ankle. Dr. Hagadorn prescribed different medicines, among them iodine, which was applied externally. Dr. Hagadorn's treatment was continued a week or two, but the ankle did not respond to the treatment or grow better. In June, 1910, plaintiff consulted Dr. Nottingham, also of the city of Lansing. This physician also took an X-ray photograph of the ankle, and later put the injured member in a plaster cast. This was worn two

weeks, taken off, and a second one applied. The second one was worn about three weeks, when it was removed. The ankle was no better. Plaintiff then consulted Dr. Gordon, who treated the injured limb with a hot solution and bandaged it. The swelling became somewhat reduced under this treatment, and during the summer of 1910 plaintiff was able to do some little work. During September of 1910 he undertook to perform ordinary labor, but found that the ankle became extremely painful and very badly swollen, so that he was forced to desist. By November 19, 1910, the ankle had assumed such a condition that Dr. Gordon, the attending physician, advised plaintiff his case was one which demanded surgical rather than medical treatment. Dr. Toles, the defendant, was thereupon called in consultation. What occurred at this consultation is set out in the testimony of Dr. Gordon who was sworn as a witness for plaintiff. In part, he testified as follows:

"I thought the condition at that time justified, and called for, amputation. That is why I called in a surgeon. I told Mr. Miller that I considered the case surgical. I called the surgeon for the purpose of consultation about the patient and advised what to do, but had in view an amputation. It was my judgment that the joint had become useless, and there was no use treating it any longer. Dr. Toles and I made a very careful examination of the joint, and the doctor said to the patient that he could not promise him anything, but that there was some chance of saving it. I think he made a remark like that. I knew in a general way of this Murphy treatment. I knew that it was reported in the journals that it had in some instances accomplished remarkable results. I knew that it was a treatment that was being used by Dr. Murphy, of Chicago, for chronic inflammatory condition of joints. Dr. Murphy is very famous as a surgeon of the joints. After the treatment the temperature came down. Along in the early part of February the limb resumed a condition similar to that in which the limb was at the time I called Dr. Toles.

There was no time when the limb became anything like normal. Even at the time when the temperature came down and there was some subsiding of the enlargement, it was still greatly enlarged all the time. Even after the exploratory examination I still thought that amputation was advisable. While he was still under the anæsthetic I remarked that it should be taken off. I don't know just why I said that because the case was really Dr. Toles' case, and yet I had been interested in the case. I examined the tissues and looked at the leg, and I remarked in a kind of aside— I remembered saying it was better off than on. I did not consider that the ankle would ever become useful. I did not pose as an expert surgeon or anything of that kind. It was just simply my own notion of it."

As a result of the consultation, it was determined by the defendant to attempt to save plaintiff's foot and ankle by the use of what is known as the "Murphy Treatment." This consists in the injection, by means of a hypodermic syringe, of a solution, the nature of which is not disclosed by the record. The first of these injections was administered November 20, 1910; the second December 3, 1910; and the third December 30, 1910. At the time the first injection was administered, the plaintiff's temperature was about 102°, indicating, probably, that the diseased condition of the ankle was causing a serious constitutional disturbance. It was doubtless this fact which induced the belief expressed by Dr. Gordon that the plaintiff's life could be saved only by amputation of the diseased limb. As a result of the injections, plaintiff's high temperature subsided. After each injection, however, plaintiff suffered severe pain, which lasted from one to three days, requiring the administration of opiates for its relief. No marked improvement followed the use of the injection and on February 14, 1911, it was determined to undertake an exploratory operation. This was performed, and the bones on the inside of the ankle were laid bare for examination. The condition

in which they were found is not disclosed by any expert testimony, although plaintiff testifies that he was assured by the defendant that the bones were all right and that a complete cure would follow. However, the ankle did not improve, but continued to grow markedly worse, until on August 7, 1912, about 18 months after the exploratory operation, plaintiff's condition became so alarming (his temperature having arisen to about 104°) that it was obvious an amputation must be resorted to or he would certainly die. The foot was therefore, upon that date, cut off.

It appears from the record that four doctors were sworn on behalf of plaintiff, although the testimony of but two of them, Dr. Gordon and Dr. Holm, is set out therein.

Briefly stated, it was the claim of the plaintiff that the defendant was guilty of malpractice:

(1) In administering the injections which he describes as an experimental remedy; (2) in failing to relieve plaintiff's pain after the administration of the several injections; (3) in carelessly and negligently conducting the exploratory operation in such a manner as to cut the muscles and tendons on the inside of the injured ankle, and in failing to support the same properly after the operation, so that plaintiff's foot gradually turned outwards. and when his weight was imposed upon it, the foot turned completely over.

Upon the conclusion of the plaintiff's case a verdict was directed for the defendant, upon the ground that the record contained no evidence tending to show that the treatment administered by the defendant in any of the particulars charged in the declaration was improper or conduced in any way to the loss of the plaintiff's foot. It is obvious from an examination of this record that at the time Dr. Toles was called plaintiff's ankle was in an extremely serious condition. It was in such a condition as, in the opinion of his attending physician, demanded amputation. Under these cir-

cumstances defendant tried a remedy which appears to have been known and approved by the profession, though perhaps not generally, and which in some instances of diseased joints had achieved remarkable results. It is apparent from the testimony of Dr. Gordon, the plaintiff's own witness, that a favorable result from such treatment was scarcely to be expected; at most, it could only be hoped for. Inasmuch as the only alternative at that time was immediate amputation, it would, in our opinion, be a strange application of the law which would hold defendant responsible for its failure. In treating a broken or diseased limb, the implied contract between the surgeon and patient is not to restore it to its natural condition, but to use that degree of diligence and skill which is ordinarily possessed by the average of the members of the profession in similar localities, giving due consideration to the state of the art at the time. 30 Cyc. p. 1573, n. 35; 39 Cent. Dig. title "Physicians and Surgeons," § 23.

While the facts touching plaintiff's injury and his subsequent treatment, step by step, are set out in the record by witnesses both lay and expert, there is absolutely no testimony from any witness in the record that the course pursued by the defendant was improper or contributed in any degree to the loss which the plaintiff suffered. No witness, lay or expert, testified that, under the circumstances of the case, the administration of the so-called Murphy treatment was not warranted. No witness, lay or expert, testified that, in making the exploratory operation, the muscles or tendons holding the foot in place were severed by the defendant. There is no testimony tending to show that the gradual turning of the foot, during the months succeeding the exploratory operation, was the result of that operation, rather than the result of the antecedent injury. It appears to be the contention of

the plaintiff that, having laid before the jury the facts surrounding the injury, the subsequent treatment, and the ultimate loss of the limb, the jury, in the absence of all testimony of an expert character tending to show malpractice, should be permitted to draw inferences of negligent conduct on the part of . defendant. We have had occasion, very recently, to pass upon this identical question. In the case of *Farrell* v. *Haze*, 157 Mich. 374 (122 N. W. 197), the following request to charge was submitted on behalf of the defendant:

"The question whether the loss of the plaintiff's foot was attributable to anything that the plaintiff claims the defendant did or omitted to do is a scientific question, which the jury cannot determine for itself, and can only be answered by an expert; and, inasmuch as no expert or medical man or surgeon has stated that the loss of the foot, in his opinion, came from anything the defendant did or omitted to do, therefore I charge you that you cannot take the loss of the foot into consideration in this case or hold the defendant liable therefor."

We held, at page 392 of 157 Mich. (122 N. W. 107), that the preferred request should have been given. Upon the same point see, also, *Wood* v. *Barker*, 49 Mich. 295 (13 N. W. 597) ; *Mayo* v. *Wright*, 63 Mich. 32 (29 N. W. 832) ; *Spaulding* v. *Bliss*, 83 Mich. 311 (47 N. W. 210) ; and *Neifert* v. *Hasley*, 149 Mich. 232 (112 N. W. 705).

We are of the opinion that the circuit judge properly directed a verdict for defendant, and the judgment will stand affirmed.

MCALVAY, C. J., and KUHN, STONE, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.