## Louisville & Nashville Railroad Company v. Morgan's Administrator.

(Decided May 4, 1928.)

(As Modified on Denial of Rehearing, October 5, 1928.)

## Appeal from Harlan Circuit Court.

1. Master and Servant.—Neither Ky. Stats., secs. 820b1-820b3, relating to liability of carriers in intrastate commerce for negligent injury to their servants, nor Federal Employers' Liability Act (45 USCA, secs. 51-59; U. S. Comp. Stats., secs 8657-8665) withhold defense of assumption of risk, except in cases where negligence consists in failing to observe some statutory requirement enacted for safety of employees.

2. Master and Servant.—Defense of contributory negligence or assumption of risk is not withheld in actions under either Ky. Stats., secs. 820b1-820b3, relating to liability in intrastate commerce for negligent injuries to servant, or Federal Employers' Liability Act (45 USCA, secs. 51-59; U. S. Comp. Stats., secs. 8657-8665), unless defendant and its injured servant were engaged in intrastate or interstate commerce.

3. Commerce.—Member of railroad construction crew engaged exclusively in blasting operations in constructing a new track, when killed by a flying rock which struck him on the head as result of explosion, held not engaged in interstate or intrastate commerce within Ky. Stats., secs. 820b1-820b3, or Federal Employers' Liability Act (45 USCA, secs. 51-59; U. S. Comp. Stats., secs. 8657-8665),

and defenses of contributory negligence and assumption of risk were therefore available to employer.

4. Master and Servant.—Experienced member of railroad construction crew engaged exclusively in blasting operations had duty to protect himself from dangers incident thereto, including seeking a place of safety during blasting operations, unless his duties required him to remain at dangerous place where he was injured.

5. Master and Servant.—It was not the duty of the foreman of a railroad construction crew to warn an experienced employee of danger of flying debris in blasting operations, except, perhaps, to give him timely information that explosion was to be made.

6. Negligence.—Where plaintiff's pleadings specified negligence on which he sought recovery, he was confined to such specifications.

7. Master and Servant.—That superintendent, in general charge of railroad's construction work, directed moving from one place to another of wire which set off explosives in blasting operations, held not to constitute an assurance of safety of either the length of the wire or the place where it was directed to be moved, as basis for submission of such issues to jury, in action for death of employee from explosion.

8. Master and Servant.—To authorize instruction on doctrine of assurance of safety, there must be an assurance of safety by one standing in position of vice principal to injured servant, and the safety of assurance by vice principal must relate and apply to the thing or place with which or at which employee was required to perform his service, and then only when servant was so required at time of injury.

9. Master and Servant.—In action for death of member of railroad construction crew struck by rock during blasting operation, evidence held insufficient to take case to jury on issues of failure to furnish reasonably safe place, implements, and appliances, failure to adopt and promulgate reasonable methods, and rules of doing work, or using excessive amount of explosives in making particular blast causing death.

10. Trial.—Instruction should be confined to issues of negligence raised by pleadings.

WOODWARD, WARFIELD & HOBSON, ASHBY M. WARREN, J. C. BAKER, JOHN C. ADKINS and LOW & BRYANT for appellant.

O'REAR, FOWLER & WALLACE and B. B. GOLDEN for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

William Morgan was accidentally killed on April 11, 1925, while in the employ of appellant and defendant below, Louisville & Nashville Railroad Company, and in which employment he had been engaged for about three months as a member of what is called in the record a "powder or blasting crew." It consisted of three per-

sons, viz., decedent, plaintiff, his father, and one Aaron Napier, the latter being foreman thereof.  For a month or six weeks the crew was exclusively engaged in blasting rock to make room for the construction of a second or double track of defendant's railroad at a point in Harlan county, and deceased was killed by a flying rock striking him on the head as a result of an explosion.  His father, the appellant and plaintiff below, qualified as his administrator and brought this action against defendant in Harlan county to recover damages for his son's death, which the petition as amended averred was brought about by the negligence of defendant in these particulars: (1) Failure to furnish decedent a reasonably safe place, safe implements and appliances in and with which to perform his work; (2) failure to adopt and promulgate reasonable methods and rules for carrying on the work; and (3) excessive amount of explosives used in making the particular blast that caused decedent's death.  It was also averred that defendant was negligent in certain other specified particulars, but all of which were but parts of the general charge in the petition as to the unsafe place, tools, implements, etc., at which and with which deceased was required to perform his duties.

The answer was a denial with pleas of contributory negligence and assumption of risk, each of which was controverted, and upon trial the jury, under the instructions submitted to it by the court, returned a verdict in favor of plaintiff for the sum of $10,000, which the court declined to set aside on defendant's motion for a new trial, and from the judgment rendered thereon it prosecutes this appeal.

Neither our statute relating to liability of carriers engaged in intrastate commerce for negligent injuries to their servants (sections 820b1, 820b2 and 820b3 of our present statutes, nor the Federal Employers' Liability Act (45 USCA, secs. 51-59; U. S. Comp. Stats., secs 8657-8665), applying to carriers engaged in interstate commerce, withhold the defense of *assumption of risk,* except in cases where the negligence consisted in failing to observe some statutory requirement enacted for the safety of employees of such carriers; nor is the defense of contributory negligence or assumption of risk, withheld from defendant in actions under either the state or the federal statute, unless defendant and its injured servant were engaged in commerce either intrastate or interstate, as was pointed out in the case of Idol v. L. & N. R. R. Co., 203 Ky. 81, 261 S. W. 878.

On page 810, sec. 467, vol. 1, of Roberts on Federal Liability of Carriers, the text says that an employee of a carrier who is engaged in *original* construction work (as distinguished from repair work, although the latter may consist in substantial physical additions to old or prior instrumentalities used in commerce) is not engaged in commerce, nor are its servants employed therein so engaged so as to deprive the carrier of the common law defenses of contributory negligence, or assumption of risk, or any other defense withheld by employers' liability statutes either federal or state. Many cases are referred to in that text wherein it was held that *original* construction work, as distinguished from repair work of the character indicated, came under neither the federal nor the state statute, if any upon the subject, and that in actions for injuries sustained by the servant so engaged all common-law defenses are available. See, also, the Idol case, supra; Young v. Norfolk & Western Railroad Co., 171 Ky. 510, 188 S. W. 621, and Thompson v. C. N. O. & T. P. Ry. Co., 165 Ky. 256, 176 S. W. 1006, Ann. Cas. 1917A, 1266. Under those authorities it is quite clear that neither the defendant nor the deceased at the time he was killed was engaged in either interstate or intrastate commerce, and that the two affirmative defenses relied on herein were available to defendant, and which does not seem to be questioned by learned counsel for plaintiff— and which brings us to a consideration of the case on its merits.

The particular task in hand at the time of the accident was the blasting of a sheaf of rock from the foot of a hill or mountain for a distance of about 80 feet and of a thickness of from about 10 to 15 feet. On the day before the explosion another crew, whose duty it was to do so, had bored 8 holes along the line of the far side of the sheaf to be blown away, and they were 8 feet apart and of a depth of from 10 to 20 feet. The process employed was to "spring" those holes before putting in the explosive for the final blast, and it was done by exploding a small amount of powder or dynamite in each hole so as to enlarge it to the capacity of receiving the necessary amount of explosives to throw away the sheaf. On the morning of the explosion Napier and the deceased put into each hole the explosive for the final blast as they had theretofore done in similar undertakings. Before that was done, however, one Wade, who had the general superintendency of the entire construction work, had disputed with Napier as to the necessary quantity of explosive that

should be put into at least some of the holes; but the evidence, at most, shows only a difference in judgment between Wade and Napier as to the required quantity. However, the latter testified, without contradiction, that he did not follow Wade's advice, although he possibly slightly increased the quantity of explosive in some of the holes above what he thought was necessary, but it is extremely doubtful if such slight increase of explosives in such holes materially or otherwise increased the hazard or danger to those engaged in the work—a matter which we will hereafter refer to.

The explosion was effected by means of an electric battery with a wire running from it to the nearest hole containing the explosives, and which latter hole was connected with all of the other loaded ones. The wire used in this case was about 200 feet long and ran away from the connected hole longitudinally and in practically a straight line, and at that distance it connected with the battery, the working of the lever of which produced the explosion. It was a part of the duties of decedent and his father to connect that wire with the nearest hole and to carry it back to the battery, and they were most generally assisted in that work by Napier. At the beginning of that process which in the record is called "stretching the wire" signals were given so as to warn surrounding people engaged in other construction work that a blast was about to be made, and that was done on this occasion some three or four minutes before the explosion. The evidence as to what occurred on this particular occasion was, in substance, that when deceased and his father got to the end of the wire at the battery Napier came up and connected it with the battery, and then cried out in a loud voice, "Fire!" two or three times, and then pulled the lever and the explosion occurred. It was also uncontradictedly proven that just before that was done deceased took his position and was standing on the end of a crosstie of the old railroad track some 6 or 10 feet immediately behind Napier, and his father was close by, and the latter said to him: "Look out, Bill! Watch!" To which the deceased said, "You look out." And Napier said in his testimony: "That is when I hollered 'Fire!' and raised the throttle of the battery to pull it and shove it back."

It was shown without contradiction that neither the deceased nor his father had any duties to perform for defendant at the place where they stood when the explosion

was made, nor were they required by the terms of their employment to stand there. It is true that plaintiff stated that sometimes there was a "dud," which meant a failure of the battery and wire to produce the explosion, and if that happened it became necessary to go over the wire to discover and rectify the trouble, but no one testified that it was either their duty or that they were required to stand near the battery at the time of the blast in order to perform the latter duty if occasion arose. On the contrary, plaintiff himself testified thus:

"We might have run and got away.

"Q. Was there anything to prevent you from running and getting to safety? A. There wasn't anything to prevent us, but I never did like to run.

. . . .

"Q. Was there anything you had to do there, either you or your son had to do, at that time, that prevented you from leaving there and going to a place of safety? A. We always stayed together.

"Q. Did you on other occasions stand right there while the shots were fired? A. Always did."

Farther along he answered:

"I supposed that if it was safe for one it was safe for all; Napier stayed there."

He also stated, however, that on this particular occasion the explosion was made so quickly that there was not sufficient time for him and his son to get much farther away unless, as he stated, they had run; but that he never did like to run. The substance of his testimony was: That while neither he nor his son had any duties to perform, nor were they required to remain at or near the battery, yet they usually did so, and that on this particular occasion they could have gotten but little, if any, farther away unless they ran, which they did not choose to do. There was testimony that a longer wire would have contributed to the safety of the work, and which is manifestly true, especially in the light of subsequent events. There was also some testimony to the effect that theretofore the wire had been stretched up or over the hill, where on account of some removed earth from above the rock to be blasted, and some scattering trees, it was possibly safer than the place to which it was removed and where it was on the occasion of the accident, and that the re-

moval of the wire was pursuant to the directions of Wade, the general superintendent of the work.

A number of errors are argued in brief as grounds for reversing the judgment, the most prominent of which was (a) the refusal of the court to sustain defendant's motion for a peremptory instruction, and (b) error in the instructions given by the court to the jury; while counsel for plaintiff seeks to uphold the judgment upon the theories averred in the petition of unsafety of the place and tools and the additional one of overcharges of explosives put in the holes, and many cases from this court are referred to defining the duty of the master in the respects mentioned and which might be applicable in this case if Napier had been killed instead of decedent, since he was the one whose duty it was and who did manipulate the battery and fired the shot, and whose duty it was to do so generally. Entirely different circumstances surrounded the decedent and his father. They, as we have seen, had no duties to perform at that place on the occasion complained of, but they may have chosen to remain there during the explosion as they had theretofore customarily done.

It therefore clearly appears to us that as to decedent this case as presented by this record is governed by the principles laid down in the cases of Corley's Adm'x v. Green-Marks Concrete Co., 154 Ky. 45, 156 S. W. 873; Delph's Adm'x v. Hassett Construction Co., 167 Ky. 190, 180 S. W. 64; and Lexington & E. R. R. Co. v. Fields, 152 Ky. 19, 153 S. W. 43. Those cases as we interpret the opinions refute the various contentions made by plaintiff in an endeavor to uphold the judgment appealed from. They each announce the duty of one engaged in blasting to protect himself from dangers incident thereto, and which includes that of seeking a place of safety, unless of course, his duties required him to remain at the place where he was injured and which was a dangerous one. But under the general doctrine of assumption of risk, if the danger in remaining at such a place was known and appreciated by the servant, then he assumed the risk by continuing to remain at that place. The same rule applies to the use of tools, appliances, and implements, and which is so well established by the law as to not require the citation of cases in its support.

But it is argued that decedent was an inexperienced servant and that he was entitled to the benefit of the law applicable in such cases. The facts, however, refute that contention. They show that he was not only a dutiful ser-

vant, but was an intelligent one. See L. & N. R. R. Co. v. Hutton, 220 Ky. 277, 295 S. W. 175; C., N. O. & T. P. Ry. Co.'s Receiver v. Finnell, 108 Ky. 135, 55 S. W. 902, 57 L. R. A. 266; L. & N. R. R. Co. v. Williams, 165 Ky. 386, 176 S. W. 1186, L. R. A. 1915E, 613; L. & N. R. R. Co. v. Bryant, 15 Ky. Law Rep. 181, 22 S. W. 606; Clifton v. C. & O. Ry. Co., 31 Ky. Law Rep. 431, 102 S. W. 247. Also, see 14 Amer. & Eng. Ency. Law, p. 882, and Shearman & Redfield on Negligence (6th Ed.) sec. 218. He had been engaged in the same character of work for more than a month prior to his unfortunate death, and it would be a reflection on his intelligence to presume or conclude that he had not learned in that time, even if he had never heard of explosions before, that it was dangerous to stand and remain sufficiently near to one as that he might be injured or killed by flying debris, nor was it the duty of Napier, the representative of defendant, at the time and on the ground, to give warning of such danger, except, perhaps, to give timely information that the explosion was to be made. See Corley case supra. But, in this case he knew of that fact, and the only negligence, if any, in connection therewith that suggests itself to our minds from a careful reading of the record was the failure on the part of Napier to give decedent sufficient time to get away after the latter and his father carried the wire to the battery and before its manipulation by Napier so as to produce the explosion. But that failure if any would not be negligence toward decedent unless (c) the battery was so near to the explosion as to be necessarily dangerous, and (d) that decedent would have sought a place of safety had time been given him for that purpose.

What we have said also applies to the alleged overcharge of the holes with dynamite, if any, since decedent himself helped to perform that operation. But such negligence (failure to give time to get away) if any, was not relied on in any of plaintiff's pleadings, and, since he specified the negligence upon which he sought recovery, he was, under many decisions of this court, confined to such specifications. Pullman Co. v. Pulliam, 187 Ky. 213, 218 S. W. 1005; L. & N. R. R. Co. v. Horton, 187 Ky. 617, 219 S. W. 1084; Manwaring v. Geisler, 191 Ky. 532, 230 S. W. 918, 18 A. L. R. 192; Belcher v. Sandy Valley & E. Ry. Co., 207 Ky. 560, 269 S. W. 729; and C., N. O. & T. P. Ry. Co. v. Heinz, 217 Ky. 43, 288 S. W. 1020.

The instructions given by the court to the jury were abstract and general and were not directed to the omis-

sions and defalcations set out in plaintiff's pleadings; and No. 5 submitted to the jury the right of decedent to rely upon assurances of safety by defendant's superintendent, Wade, and which plaintiff's counsel attempt to justify under an allegation in an amended petition (with some testimony to support it) with reference to the removing of the wire from the top of the hill to the ditch below; but neither that allegation, nor the testimony offered in its support, measured up to the legal requirements, so as to entitle an injured servant to the benefit of the doctrine of assurance of safety, since we nowhere find in the testimony where Wade made any expression or assurance of the safety of either the length of the wire or the place where it was located in the ditch. If, however, the record were otherwise on that point, then it would not authorize an instruction on that doctrine as we will proceed to demonstrate. In order to entitle a plaintiff to the benefit of it, conceding that the pleadings and the proof authorized it, there must first be an assurance of safety by one standing in the position of vice principal to the injured servant, and the "safety" of assurance by the vice principal must relate and apply to the *thing* or *place,* with which, or at which, the servant was *required* to perform his service, and then only when the servant was so required at the *time* of the injury. We have before pointed out that neither decedent nor his father was required by either Wade or Napier to stand where plaintiff received his injuries, or near Napier, who was the operator of the exploding apparatus at the time. On the contrary, as we have also pointed out, the evidence shows that they remained there because they did not want to exercise themselves to get away, *and* that they thought that, if it was safe for Napier, it would be safe for them. The assurance of safety doctrine contended for would perhaps apply, if decedent had himself produced the explosion instead of Napier, and he had been assured by either Napier or Wade that the place where that apparatus was located, or its distance from the explosion, was safe, unless that, notwithstanding such assurance, the danger was so apparent that an ordinarily prudent person would not obey it. The record being in such condition, there was no room for instruction No. 5, and it should not have been given, even if its wording was correct, a question we do not determine.

Under the condition of the record as brought to this court we are constrained to hold that the motion of de-

fendant for a peremptory instruction should have been sustained, and if on another trial it is in substance the same, and the motion should be made, the court will sustain it. If, however, there should be a change made in the pleading and there should be evidence thereunder to sustain any alleged actionable negligence, the court will confine its instructions to such issues.

Wherefore, the judgment is reversed, with directions to grant the new trial, and to set aside the judgment, and for proceedings consistent with this opinion.