## Stacy et al. v. Williams.

(Decided March 13, 1934.)

354

W. L. HAMMOND, N. R. PATTERSON, L. R. CURTIS and LOW & BRYANT for appellants.

F. D. SAMPSON and J. M. ROBSION for appellee.

OPINION OF THE COURT BY JUDGE RICHARDSON—Reversing.

Dr. Stacy resides at Pineville, Bell county, Ky., and engages in the general practice of medicine and surgery. The Stacy-Chappell Hospital is privately owned, and engages in the business of receiving patients and furnishing them hospitalization. Ira Williams resides at "Four Miles," Bell county, and, at a salary of $144 a month, engages in the work of a fireman of the Kentucky Utilities Company.

On June 1, 1930, Williams was run into by an automobile, resulting in the breaking of his right leg, four inches above the knee. He was carried at once to the Stacy-Chappell Hospital where he procured the services of Dr. Stacy. He remained at the hospital 83 days, when he was removed to a hospital at Middlesboro, Ky. The services of Dr. Stacy and the Stacy-Chappell Hospital were thereafter discontinued.

Williams brought this action to recover $25,000 damages of Dr. Stacy and the Stacy-Chapell Hospital, on the charge of malpractice. On a trial before a jury he was awarded $5,500.

Williams, in the practice of the case, and the court, in his instructions to the jury, considered the petition as containing a charge of general negligence. The correctness of this theory of the case must be determined by the allegations of the petition. A careful examination of it convinces us the practice of the case and the instructions of the court in this respect were not authorized by its allegations. To make accuracy assured, we state his cause of action in the language of the petition:

"These defendants of their gross negligence and carelessness failed and neglected to properly diagnose said break or injury, and in their further negligence and carelessness and as a direct result of their unskillful attempt to readjust and reset and co-apt said bones, the defendant, said C. B. Stacy, in whom it trusted to dress, treat and adjust said broken bone, wrongfully, improperly and unskillfully made an incision into his leg and made it necessary at a later date to cut off and remove a great portion from the said broken bone and then of their further gross and careless, unskillful and improper, conduct, attempted to place and did place a silver plate across said broken joint and in his femur and attempted and fastened same by means of screws, and then bound up the same and left his leg improperly secured until said screws came out of said plate and bound and imbedded themselves within the flesh of his leg and remained there for many days. * * * The defendants injected or caused to be deposited within said broken or injured area foreign substance in addition to said plate and screws, * * * and thereby caused gangrene or pus to set up in said injured parts; * * * that after he left said hospital he was compelled on account of the negligent way and manner treated and left by this defendant, to undergo a second operation. * * * No proper diagnosis was made of said broken femur when he was first received in said hospital, or at all, by these defendants and same was grossly neglected for a period of some 16 or 17 days. No proper precaution or care was used in treating said

broken limb, after which the defendant wrongfully, improperly and negligently made said open incision, thereby causing an infection of said limb. * * * As a result of said wrongs and injuries he not only suffered great mental and physical pains, and will continue to suffer, so long as he lives, but he had to expend for additional doctors' bills, etc.''

It is elemental a plaintiff must allege that which he wishes to prove, and his pleading and proof must agree. ''Negligence may be alleged generally. Illinois Cent. R. Co. v. Cash's Adm'x, 221 Ky. 655, 299 S. W. 590. Under such an allegation of negligence the plaintiff may prove any act of negligence of the defendant [Monroe v. Standard Sanitary Mfg. Co., 141 Ky. 549, 133 S. W. 214], but, where he alleges special acts of negligence [L. & N. R. Co. v. Kirby, 173 Ky. 399, 191 S. W. 113; L. & N. R. Co. v. Mitchell, 162 Ky. 253, 172 S. W. 527; C. & O. R. R. Co. v. Cooper, 168 Ky. 137, 181 S. W. 933; Pullman Co. v. Pulliam, 187 Ky. 213, 218 S. W. 1005; L. & N. R. Co. v. Morgan's Adm'r, 225 Ky. 447, 9 S. W. (2d) 212; Park Circuit & Realty Co. v. Coulter, 233 Ky. 1, 24 S. W. (2d) 942], or where the petition contains a charge of general negligence, coupled with the specific acts of negligence, he is confined to the specific acts [L. & N. R. Co. v. Horton, 187 Ky. 617, 219 S. W. 1084].'' See American Sav. Life Ins. Co. v. Riplinger, 249 Ky. 8, 60 S. W. (2d) 115, 119.

The petition is not susceptible of the construction it contains a charge that in administering the anesthetic, the examination of his leg with the fluoroscope, the placing in apposition the parts of the broken bone and in the use of the ''Thomas Splint and Buck's Extension,'' the same were done negligently, or not at all. Without an allegation in the petition charging same were done negligently, or not done at all, it was not proper to admit evidence as to this subject, nor to instruct the jury so as to authorize it to assess damages therefor.

According to its own language, the petition pitches Williams' cause of action on the failure to make a diagnosis; negligence in ''an unsuccessful attempt to readjust, reset and co-apt'' the bone of his leg; ''unsuccessfully making an incision into his leg,'' and thereafter negligently caring for and treating it. However, we shall consider and dispose of the case on the theory on which it was practiced by Williams and tried by the court.

Excepting the testimony of Williams and that of Dr. Pierce Martin and wife, it is shown without contradiction that as soon as Dr. Stacy arrived at the hospital on the night Williams was brought in, the bruises and lacerations on the head and leg of Williams were repaired; an anesthetic administered; his leg looked over and examined with the fluoroscope; the break in the bone located; the broken parts placed in apposition; and the "Thomas Splint and Buck Extension" used in the completion of the setting of the leg.

A "Thomas Splint and Buck's Extension" consists of two parallel rods about a half inch in diameter and adjustable for the length of the leg, and which is fastened at the top to a circular hoop or ring adjusted to fit the thigh at its junction with the body. This steel ring or hoop is covered with a soft leathery substance or padding. The rods are fastened together at the bottom or lower end by an adjustable screw plate to fit the bottom of the foot. The two parallel rods extend from the hoop or ring the entire length of the leg and on the inside and outside of the injured limb. A metal pulley is fastened to the foot of the bed, and suspended to this pulley is a cord bearing a number of weights and hanging down towards the floor. The upper end of this cord extends from the pulley through the foot rest of the parallel rods and is attached to adhesive dressings on the leg below the seat of the fracture. The design of the arrangement is to keep the leg in position and reduce the contraction of the large muscles of the thigh above the fracture and prevent the broken bone from getting out of apposition or place after having been set or reduced. The adjustable foot plate, the adhesive dressings, and the parallel rods and circular hoop or ring and weights are all so designed as to render the leg immobile and keep the broken bones in apposition until union can be effected by natural bone secretions.

Dr. Pierce Martin and Mrs. Martin admit the use of the "Thomas Splint and Buck's Extension," except they claim they saw no weights attached by an adhesive or otherwise; also, they claim Dr. Stacy made the statement he would set Williams' leg within a day or two, notwithstanding they admit he and his assistant, with the nurses present, performed the services in every respect, as above described, except the use of the weights. Thereafter during the night, Williams, with his hands, pushed the "Thomas Splint and Buck's Extension"

down his leg, until the weights became useless. Dr. Stacy was sent for early the next morning, came and readjusted the "Thomas Splint and Buck's Extension," and advised Williams not only of the importance, but of the necessity, of his co-operating with him in the treatment administered, else he would have bad results. Drs. Giannini and Maw, the nurses present, and other patients of other physicians, who occupied the ward with Williams, detail his pushing down his leg the "Thomas Splint," thereby destroying the use of the weights. Dr. Ramsey, a friend of the Martins, testified to the presence and use of the "Thomas Splint" and weights. Except the testimony of Williams, it is overwhelmingly established by other inmates of the ward occupied by him, the nurses, Drs. Maw, Stacy, and Giannini, that Williams continued to interrupt and prevent the use, for days, or as long as the same were used, of the "Thomas Splint" and weights. About eight days after his leg was first set it was examined with the fluoroscope, or X-ray, when it was found the broken bone had lapped. Sand bags were used instead of the "Thomas Splint and Buck's Extension." Finally it was decided by Dr. Stacy and his assistant, Dr. Maw, that on account of the disobedience of Williams, his absolute refusal to receive treatment by the use of the "Thomas Splint and Buck's Extension," the "open operation" was indispensably required for a proper treatment of his limb. Dr. Stacy so informed Williams, and later also notified Dr. Pierce Martin and wife, he would perform the "open operation." Evidence was admitted tending to show Dr. Stacy performed this operation without the consent of Williams or previous knowledge of Dr. Pierce Martin and wife. There is no allegation in the petition the operation was performed without the knowledge and consent of Williams; therefore, the evidence tending to show it was so performed was improper. We pause to note that Dr. Pierce Martin and wife substantially state they had no knowledge Dr. Stacy was going to perform the "open operation" until about the time it was commenced, yet the evidence shows Mrs. Martin by a letter informed a relative the operation would be performed on the day it was performed. It was immaterial whether Dr. and Mrs. Martin were notified. Such evidence was incompetent. Before the "open operation" was performed the broken bone had lapped and become "fixed." From the time this occurred until the day of the operation, Williams'

leg was sterilized, preparatory for the operation, by the use of antiseptics, lights, and other defensive means to prevent infection when the operation was performed. This preparation was continued five or six days next before the operation. On the morning of the operation his leg was thoroughly sterilized again.

In the performance of the operation, Drs. Giannini and Maw assisted Dr. Stacy; Dr. Pierce Martin administered the anesthetic. Before commencing the operation, the doctors and nurses "surgically cleaned or sterilized" themselves, by the use of a basin where with a foot pedal they scrubbed their hands with hot water and brushes for ten or fifteen minutes, then applied alcohol, bathed and further sterilized and cleaned their hands, to the tips of their fingers by the use of iodine; they dressed in the usual room uniform, and sterile mask and cap, with gauze in their mouth and nose to prevent the possibility of germs entering the wound while operating. It should be noted evidence showing the statement of Dr. Martin relating to his suggestion not to make the incision in the back portion of the leg was admitted. The incision was made in the front of the leg. Therefore, the disputed statement of Dr. Martin was immaterial and irrelevant.

After Williams was reduced to sleep by an anesthetic, his leg again was gone over with iodine, which was left on it for three or four minutes, then cleaned off with alcohol, wrapped in sterile goods (cloth made sterile), sheets, pillows, and gauze that had been sterilized by being put in a steam sterilizer for twenty minutes where the steam rose to a certain pressure so as to make same absolutely sterile. The correctness of the temperature of the sterilizer was determined by a thermometer that rigestered the inside temperature of the sterilizer. His leg was open from the front to the bone, the covering of the bone scooted back. The lapped portion of the bone was pried apart, loosened, and brought end to end. The overlapping of the parts was about 2½ inches. This character of overlap corroborates the statements of the witnesses, disclosing the disobedience of Williams and his intentionally moving his leg after the application of the "Thomas Splint and Buck Extension," and before the open operation. While the incision was being made and during the operation, the skin was folded back and the folded edge of a sterile towel used to prevent carrying any infection from the

skin to the wound. When the bone was reached Drs. Giannini and Stacy removed the gloves used up to this point in the operation, then changed gloves before they began working with the bone itself. Then they used Lane's plate, which is a light, thin, pliable steel. It is made with two eyes, one at each end for screws. An entry was made in the bone of the leg for proper use of Lane's plate with the eye in the end over the entry in the bone. The purpose of the plate and the screws is to hold the bone in exact position, and is of a nature not to cause bone irritation. The eyes of the plate were placed over the entries in the bone and the screws inserted in the eyes and the bone. The fascia was sewed back with cat gut until the skin was reached, when small metal clips were used to hold the skin together. The clips cause less irritation to the skin and less likelihood of skin infection and are easier used and easier taken out than the needle and cat gut. After the operation was completed, the leg was first surrounded with cotton and dressing put over the incision and the whole leg wrapped in cotton over a piece of underwear to make a soft smooth dressing; then the plaster Paris was applied. It is a white material, soft when applied and becomes hardened, rendering the limb immobile. As soon as the plaster Paris dried an opening was made in it over the incision for the purpose of getting in to see and dress the wound through the opening. The testimony of the experts agrees that the process of sterilizing the hands, the bodies, the material, including Lane's plate and the screws used in the operation, and the manner and method of using same as well as handling, making and completing the entire "open operation," were according to the recognized standard used by experienced, learned, and skilled physicians and surgeons, generally, throughout the country.

After the operation was fully completed, Drs. Martin, Maw, Giannini, and Stacy agreed it was complete and prefect. The ends of the bone were seen with the naked eye and were set in perfect apposition.

The physicians and surgeons who testified for Dr. Stacy, in answer to hypothetical questions in chief, and those who testified for Williams, on cross-examination, agree that in injuries of this kind it is frequently necessary to do an "open operation"; that is, to make an incision in the leg over the fracture and to tie or fasten the bones together by Lane's plate, or some other ac-

cepted method. Lane's plate method has been in use for a long period of time and is used generally by the best hospital and orthopedic surgeons. Sometimes it is advisable to wait for several weeks before this form of reduction is made; much depending on the physical condition of the patient and whether the bone can be held in apposition by external splints and traction. Infection is an elusive, implacable, ever-present enemy of the surgeon. It may and does occur, inexplicably, in the best regulated hospitals and under the most favorable conditions, even though the surgeon might have used the highest degree of care and skill. When it does appear, naturally it is hard to control and there is often a necrosis of the bone and the screws in the bone will become loose, and for bones to remain in apposition, and to avoid infection, the patient must give to the physician the fullest co-operation; but in cases where such co-operation is given it is always possible for the ends of the bones to slip and for infection to occur, notwithstanding the greatest care and skill on the part of the physician.

Whenever the patient is intractable, unmanageable and nonco-operative, or removes such forms of dressings, it is not unusual and the chances are it is imperative to perform the "open operation"; i. e., making an incision through the skin and soft structure, exposing the bone at the points of fracture and introducing some foreign substance, such as gimlets, wires, nails, beef bone pegs or bone grafts or screws into the bone substance itself, in order to maintain an internal fixation at the points of fracture in the bone, so that nature may heal the injury.

As soon as Williams recovered from the effects of the anesthetic he began to complain of the cast and to work it away from the hip and limb. On account of this conduct within a short time another cast was required and placed on his limb; but he continued thereafter to interrupt it and interfere with its use. In his testimony he admits he used for this purpose a knife, which was brought to him with his food, which he seems to have secreted for that purpose. Drs. Stacy and Maw, and the nurses, repeatedly forbade him interrupting the cast, and advised him if he did not submit to its use his operation would be unsuccessful and as a result his limb would be in bad shape.

His wife and aunt, Mrs. Martin, employed for Wil-

liams Miss Edna Lawson, a trained nurse with 11 years experience, to care for his limb. She took charge on June 16th, immediately after the "open operation" was completed and after the first cast was placed on his leg. He was not completely from under the anesthetic at the time she did so. Dr. Stacy advised her to have Williams be kept as quiet as possible. She says the opening was left in the cast over the incision for the purpose of dressing the wound. Williams would take the dressing off the incision. She often advised him, and did so once in the presence of his wife, of the danger of his so doing, when his wife stated she "told him not to do it." She reported Williams' acts to the head nurse to whom it was her duty to make reports when Dr. Stacy was absent. She also reported Williams' acts to Dr. Stacy. A few days after the "open operation" she discovered a stitch abscess, and thereafter on returning to the room she found Williams again removing the dressing when she again reprimanded him for it; he informed her his leg was hurting. The stitch abscess appeared on the skin where a clip held it. Miss Lawson states Williams would not follow her instructions, nor those of Dr. Stacy. "He just pulled at the cast and moved his foot around with his other foot; that is, moved his right foot with his left." She caught him in this act several times. The so moving of his leg would, of course, put it in motion. She warned him of what might happen if he did not quit keeping his leg in motion by working it; "that his leg could not stand it." He would pull at the pillows under his heel and sometime when he had visitors he would have them to move his leg and change him from one position to another; on one occasion he had a colored man, an orderly of the hospital, to move his leg, when he permitted it to fall. He often would try to cut the cast off, or work it off by pulling and pushing on it, and he would declare the cast was hurting his leg. He would catch hold of the cast and try to move it about. On this account the cast was split. She had the colored orderly to help her split it. She remained in his services as nurse for 11 days. He would not allow her to sleep. She was required to stay up with him most of the time. He would move himself about and complain so much and make so much racket and noise she could not sleep. Finally, because of his disobedience and nonco-operation with her, Dr. Stacy, and assistants in the treatment of his leg, and not desiring to be responsible for him as her patient, she sur-

rendered her position and ceased to render him services. Some days after the "open operation" was completed, Dr. Stacy attended a medical association for several days. He made arrangements with Dr. Maw, an experienced, learned, and qualified physician, to attend, during his absence, and care for Williams, in connection with the nurse, Miss Lawson.

It is a matter of general knowledge that with a broken leg, such as was sustained by Williams, after it is set and the "Thomas Splint and Buck's Extension" have been applied, a patient does not require the continuous presence of a physician, if he abides by the instructions of his nurse and physician and reasonably co-operates with them. In such case the physician is negligent only in allowing intervals to elapse between visits to his patient where attention is needed. Neudeck v. Vestal, 117 Cal. App. 266, 3 P. (2d) 595. It is plain the presence of Dr. Stacy, or of Dr. Maw, or of the nurse, Miss Lawson, neither kept nor prevented Williams from interfering with and practically destroying the benefits of the services rendered him by his continuous and persistent disregard of their instructions. Dr. Stacy fulfilled his obligation to Williams by furnishing the services of Dr. Maw during his absence. X-ray pictures were taken of Willams' leg on three different occasions; on the 2d day of July, on July 20th, and on August 19th. The pictures taken on July 2d showed the bone was in excellent position, despite the disobedience of Williams. The one taken on July 20th showed the fracture was in fair condition, notwithstanding the abuse and bad treatment of the leg by Williams himself. The pictures taken August 19th portrayed the parts of the broken bone displaced, overlapped, and infected.

Much ado is made of the infection appearing in the leg of Williams after the operation and continuously until he was removed from the hospital. Whatever may have been the source of the infection or its extent, neither its presence nor its effect caused the broken parts of the bone to lap, as disclosed by the pictures of August 19th. The overlap of the broken parts of the bone is convincing evidence of improper use of the leg, and strongly corroborates the testimony of Miss Lawson, Miss Snavely, the head nurse, Dr. Maw, Dr. Stacy, A. E. Mullins, Herbert Ledford, Rodie Tucker, Lizzie Goodin, Miss Doss, another nurse, and Jonas Johnson, describing his intentional, deliberate acts, preventing

proper treatment, and refusing to follow the instruc-tions of the nurses, Drs. Maw and Stacy, and to co-op-erate with them to care for safely, and protect, the normal condition of the broken bone. The testimony of these witnesses is abundantly corroborated by the testi-mony of Dr. Giannini, who participated in the perform-ance of the ''open operation,'' and by that of Dr. Ram-sey, who was solicited by Williams' relatives to assume charge, in whole or in part, of Williams as a patient,. while in the hospital, but declined and refused to do so,. because he was an incorrigible patient.

The meticulous description of the preparation for the ''open operation,'' its performance and the care given the leg of Williams by the application of the cotton, cast, etc., are admitted by every witness for Wil-liams and for Stacy, except Williams denies there was a window or opening in the cast left for the purpose of dressing the incision. In his brief Williams makes the statement the screws used in the bone and Lane's plate were not sterilized; thus he attempts to account for the presence of infection. Dr. Giannini was asked and an-swered as follows:

''Q. All were sterilized and the instruments and stuff you used, in the usual way? A. Yes, Sir, all the things were sterilized.''

After the ''open operation'' was completed, the wound was dressed every day, sometimes twice a day, and after the infection appeared the wound was drained and kept drained with tubes, irrigated, and the pus washed out with Dakin's solution to destroy the infection. Dr. Giannini not only was present and participated in the operation, but in the placing of Williams' leg in the, sec-ond cast which went up around Williams' body for the purpose of preventing him removing it from his leg and to keep the leg immobilized. A roll of cotton was placed at this time around his hips to make it soft and comfort-able. Double precaution was used to insure absolutely his comfort.

A large number of physicians and surgeons of dis-tinction, with established reputations, testified in behalf of Stacy. In answer to hypothetical questions embrac-ing the facts as proven by numerous disinterested wit-nesses, describing the services rendered Williams by Dr. Stacy on the night he was carried to the hospital, also the performance of the ''open operation,'' and

thereafter, and so long as Williams was at the hospital, they unqualifiedly declare the services and work of Dr. Stacy conformed to the standard in general use by learned, skilled, and experienced physicians in similar communities. Also, Drs. Pierce Martin, Henry Brooks, Mason Combs, W. K. Evans, J. T. Evans, and others who were introduced by Williams, on cross-examination, in their answers to hypothetical questions, agree with the physicians and surgeons introduced by Dr. Stacy.

A very satisfactory statement of what we conceive to be the law in such cases was stated in Pike v. Honsinger, 155 N. Y. 201, 49 N. E. 760, 762, 63 Am. St. Rep. 655:

"Upon consenting to treat a patient, it becomes his duty [the physician or surgeon] to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed. He is under the further obligation to use his best judgment in exercising his skill and applying his knowledge. The law holds him liable for an injury to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment. The rule in relation to learning and skill does not require the surgeon to possess that extraordinary learning and skill which belong only to a few men of rare endowments, but such as is possessed by the average member of the medical profession in good standing. Still, he is bound to keep abreast of the times, and a departure from approved methods in general use, if it injures the patient, will render him liable, however good his intentions may have been. The rule of reasonable care and diligence does not require the exercise of the highest possible degree of care, and, to render a physician and surgeon liable, it is not enough that there has been a less degree of care than some other medical man might have shown, or less than even he himself might have bestowed, but there must be a want of ordinary and reasonable care, leading to a bad result. This includes not only the diagnosis and treatment, but also the giving of proper instructions to his patient in relation to conduct, exercise, and the use of an injured limb. The rule requiring him to use his best judgment does not hold him liable for a mere error of judg-

ment, provided he does what he thinks is best after careful examination. His implied engagement with his patient does not guaranty a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care, and to exert his best judgment in the effort to bring about a good result."

See similar statement in Nash v. Royster, 189 N. C. 408, 127 S. E. 356. "A physician can be held liable only for such injuries as are shown proximately to have resulted from the failure on his part to perform the duty which he owed to his patient; if the injuries for which recovery is sought are shown to have resulted from negligence on the part of the patient, either alone or simultaneously and in co-operation with the alleged negligence of the physician, then the patient has no right to recover damages from the physician"; but "where a physician has been guilty of negligence resulting in injury to the patient and the patient subsequently, by his own want of care, aggravates the injury sustained primarily at the hands of the physician, the physician will be liable only for the injury proximately resulting from his own negligence, and not for the aggravation caused by the negligence of the patient." Halverson v. Zimmerman, 60 N. D. 113, 232 N. W. 754; McDonnell v. Monteith, 59 N. D. 750, 231 N. W. 854.

The law as it relates to the physician or surgeon neither exacts omniscience nor imposes the onerous responsibilities of the insurer. He is liable only in the performance of his services if he either did some particular thing or things that physicians or surgeons of ordinary skill, care, and diligence would not have done under the same or similar circumstances, or failed to do some particular thing or things, which physicians or surgeons of ordinary skill, care, and diligence would not leave undone under the same or similar circumstances. Ault v. Hall, 119 Ohio St. 422, 164 N. E. 518, 60 A. L. R. 128. He is bound to bestow such reasonable and ordinary care as learned and skilled physicians and surgeons in similar neighborhoods engaged in the same general line of practice ordinarily exercise in like cases. Burk v. Foster, 114 Ky. 20, 69 S. W. 1096, 24 Ky. Law Rep. 791, 59 L. R. A. 277, 1 Ann. Cas. 304; Stevenson v. Yates, 183 Ky. 196, 208 S. W. 820; Hoover v. McCormick, 197 Ky. 509, 247 S. W. 718.

The presumption of negligence is never indulged in

from the mere evidence of mental pain and suffering of the patient, or from failure to cure, or poor or bad results, or because of the appearance of infection. The burden of proof is upon the patient to prove the negligence of the physician or surgeon, and that such negligence was the proximate cause of his injury and damages. Ault v. Hall, supra; Rawleigh v. Donoho, 238 Ky. 480, 38 S. W. (2d) 227. The doctrine of res ipsa loquitur has no application in such cases. Miller v. Blackburn, 170 Ky. 263, 185 S. W. 864; Donoho v. Rawleigh, 230 Ky. 11, 18 S. W. (2d) 311, 69 A. L. R. 1135; Prewitt v. Higgins, 231 Ky. 678, 22 S. W. (2d) 115; Loudon v. Scott, 58 Mont. 645, 194 P. 488, 12 A. L. R. 1487. Therefore, the failure to effect a cure or to obtain the result expected by the patient does not raise the presumption of a want of proper care or a lack of skill and diligence (Miller v. Blackburn, supra), nor create an inference of incompetency or negligence. Western Union Tie Co. v. Mason, 232 Ky. 237, 22 S. W. (2d) 602. He is not responsible for the erroneous exercise of judgment, provided he informs himself of the facts by proper investigation. Casenburg v. Lewis, 163 Tenn. 163, 40 S. W. (2d) 1038. The presence of infection following an operation is neither prima facie evidence of, nor per se, negligence. Rawleigh v. Donoho, supra; Loudon et al. v. Scott, 58 Mont. 645, 194 P. 488, 12 A. L. R. 1487.

The facts necessary to establish a cause of action against a physician or surgeon for malpractice can only be proven by experts, skilled in medicine or surgery, qualified to testify where the matter in issue is exclusively within the knowledge of experts. The right of recovery cannot be established by the testimony of laymen unless the subject-matter involved is common knowledge or ascertainable by nonexpert's senses. Donoho v. Rawleigh, supra; Rawleigh v. Donoho, supra; Rising v. Veatch, 117 Cal. App. 404, 3 P. (2d) 1023. And where the proof of facts which show or tend to show negligence on the part of the physician or surgeon depends upon expert opinion, if it shows nothing more than error of judgment, there is in law no proven facts upon which the inference of negligence may be founded. Nicholas v. Jacobson, 113 Cal. App. 382, 298 P. 505. For like reasons where expert evidence fails to show negligence of the physician or surgeon, and there is no evidence to indicate an act or omission on his part within the common knowledge of a layman, the jury cannot

infer negligence and a peremptory is proper. Nicholas v. Jacobson, supra; Farrell v. Haze, 157 Mich. 374, 122 N. W. 197; Miller v. Toles, 183 Mich. 252, 150 N. W. 118, L. R. A. 1915C, 595. The appearance of an injured person after the treatment of a physician or surgeon has commenced, and the patient's declarations respecting existing pain, or its severity, may be proven by the testimony of laymen; but whether the negligence of the attending physician or surgeon was the primary cause thereof must be established by expert testimony, Donoho v. Rawleigh, 230 Ky. 11, 18 S. W. (2d) 311, 69 A. L. R. 1135; Rawleigh v. Donoho, 238 Ky. 480, 38 S. W. (2d) 227; Barrett's Adm'r v. Brand, 179 Ky. 740, 201 S. W. 331; Kuehnemann v. Boyd, 193 Wis. 588, 214 N. W. 326, 215 N. W. 455; Gallagher v. Kermott, 56 N. D. 176, 216 N. W. 569; Halverson v. Zimmerman, supra; Bennett v. R. R. Co., 2 N. D. 112, 49 N. W. 408, 13 L. R. A. 465; 3 Jones Commentaries on Evidence, (2d Ed.) page 226, sec. 1213.

A recovery will not be allowed a patient where he is in pari delicto. And all parties participating in moral delinquency or turpitude are deemed in pari delicto. M. H. T. Co. v. L. & N. R. Co., 214 Ky. 822, 284 S. W. 104; Cooley on Torts, p. 7; Louisville Taxicab & Transfer Co. v. Reno, 237 Ky. 452, 35 S. W. (2d) 902. There is a clear distinction in the legal significance of the terms "proximate cause," "concurrent cause," and "efficient cause," or "contributory cause." "Proximate cause" is that cause of an injury, which, in natural and continuous sequence, unbroken by any efficient intervening cause, produced the injury, and without which the injury would not have occurred or it is that act or omission which immediately causes or fails to prevent the injury.

A "concurrent cause" is that cause which acts contemporaneously to produce a given result. See 22 R. C. L. 128. "If two distinct causes are operating at the same time to produce a given result which might be produced by either, they are concurrent causes; i. e., they run together as a related significance to the same end." See Herr v. City of Lebanon, 149 Pa. 222, 24 A. 207, 16 L. R. A. 106, 34 Am. St. Rep. 603.

"An efficient cause may sometimes be better described as the primary or reasonable cause of a legal liability—though first in point of time and most re-

mote." See Bole v. Pittsburgh Athletic Co., 205 F. 468, 123 C. C. A. 536, 46 L. R. A. (N. S.) 602.

A "contributory cause" is "that cause which, under the same circumstances, would always be an element aiding in the production of a result." See Broschart v. Tuttle, 59 Conn. 1, 21 A. 925, 11 L. R. A. 33. This term is synonymous with "contributory negligence." Hummer's Ex'x v. L. & N. R. R. Co., 128 Ky. 486, 108 S. W. 885, 32 Ky. Law Rep. 1315; Smith v. P. T. Co., 179 Ky. 322, 200 S. W. 460. As an example of what does not constitute contributing cause or contributory negligence, is where one engaged in work and momentarily forgets its dangerous character and thoughtlessly turns his eyes aside, when something is happening to detract him, thereby allowing his hands to be drawn into the machinery he is operating, and is injured, he is not guilty of contributory negligence as a matter of law. If Williams inadvertently or thoughtlessly moved his leg, or touched his hand on the wound in his leg, such would not constitute contributory negligence.

Applying these definitions to the acts and conduct of Williams in the intermeddling with the treatment of Dr. Stacy and the nurses, amounting in fact to a prevention of a proper treatment of his limb, it is a mere matter of conjecture, surmise, and speculation, even if it be conceded arguendo Dr. Stacy was guilty of the negligence alleged, whether his own acts and conduct were the proximate, the concurrent, or the efficient, cause of the mental suffering, pain, and injury for which he now sues. On the evidence adduced, and still conceding the alleged negligence of Dr. Stacy, his assistant, and the attending nurses, it would be a mental impossibility for a jury to determine whether the cause of his mental and physical pain and injury was his own acts and conduct, or the alleged negligence of Dr. Stacy and his assistants. This fact brings the case within the familiar rule that, "where the evidence is equally consistent with any one of two or more states of case upon which one may theorize as to the cause of the accident, it is not competent for the judge to leave the matter to the jury. C. & O. Ry. Co. v. Bagby, 155 Ky. 420, 159 S. W. 964, 965. An interesting discussion of this question may be found in U. S. Law Review, vol. 47, p. 396."

Williams declares he was an amiable, a docile, and a submissive patient, obedient to the admonitions and

advice of the physicians and nurses, except he inadvertently admits he retained a knife delivered to him for use at his meals, and used it in his efforts to remove the plaster cast; but all of the nurses, helpers, and physicians, and other occupants of the ward, patients of other physicians, declare, positively contrariwise, and that he was continuously disobedient, incorrigible, and obstreperous, until he became emaciated and too weak to perform. He was permitted to show Dr. Stacy had stated on certain occasions Williams was progressing nicely. Such testimony did not tend to show negligence on the part of Dr. Stacy. Maloney v. Brackett, 275 Mass. 479, 176 N. E. 604.

When the whole evidence is tested by the principles reiterated, it is a matter of mere conjecture, surmise, or speculation, whether the mental and physical pain and injury for which Williams sues were the proximate result of his own acts, either alone or simultaneously and in co-operation with the alleged negligence of Dr. Stacy, especially in view of the accepted rule that the negligence of Dr. Stacy can only be established by the testimony of experts. Conjecture, surmise, and speculation are insufficient upon which to rest a verdict of a jury. L. & N. R. R. Co. v. Mann's Adm'r, 227 Ky. 399, 13 S. W .(2d) 257; Cochran's Adm'rs v. C. & O. Ry. Co., 232 Ky. 107, 22 S. W. (2d) 452; Park Circuit & R. Co. v. Ringo's Guardian, 242 Ky. 255, 46 S. W. (2d) 106. Damages recovered in any case must be shown with reasonable certainty, both as to their nature and in respect to the cause from which they proceed. S. H. Kress & Co. v. Sharp, 156 Miss. 693, 126 So. 650, 68 A. L. R. 167.

In C., N. O. & T. P. Ry. Co. v. Rue et al., 142 Ky. 694, 134 S. W. 1144, 1146, 34 L. R. A. (N. S.) 200, was written the applicable rule:

"It is the province of a jury to pass upon and decide questions of evidence, and especially is this so, if the evidence is contradictory or conflicting; but it sometimes becomes the duty of the trial court, even where there is evidence both for and against the party seeking a recovery, to enter a nonsuit or direct the finding of the jury. This duty the law imposes on the court when the evidence as a whole fails to show a right of recovery in the party seeking it, or, to express our meaning in language employed by this court: 'To authorize an instruc-

tion as in case of a nonsuit, it should appear that, admitting his testimony to be true, and every inference that is fairly deducible from it, the plaintiff has still failed to support his claim.' "

See Shay v. R. & L. T. R. Co., 1 Bush, 108; Morris' Adm'r v. L. & N. R. R. Co., 61 S. W. 41, 22 Ky. Law Rep. 1593; So. Ry. Co. v. Goddard, 121 Ky. 567, 89 S. W. 675, 28 Ky. Law Rep. 523, 12 Ann. Cas. 116.

Fairly appraising the facts adduced in the light of this principle, it is plain Dr. Stacy was entitled to a directed verdict on the whole of the evidence. Raw·leigh v. Donoho, 238 Ky. 480, 38 S. W. (2d) 227; Loudon v. Scott, and Miller v. Toles, supra.

Williams, over the objections of Dr. Stacy, was permitted to ask Drs. Martin, Brooks, Evans, Tuggle, Combs, and perhaps other physicians and surgeons, hypothetical questions. It is an accepted rule that such questions propounded to experts must be based upon and relate to the facts proved in the case. K. T. & T. Co. v. Humphrey, 168 Ky. 611, 182 S. W. 854; Wigginton v. Wigginton's Ex'r, 205 Ky. 613, 266 S. W. 245. Such questions calling for the witnesses' conclusions, instead of giving opinions as to the effect of the matter submitted to them in the hypothetical question, is improper and constitutes an error. Samuels v. Willis, 133 Ky. 459, 118 S. W. 339, 19 Ann. Cas. 188; A. L. I. Co. v. Bethel, 140 Ky. 609, 131 S. W. 523; Madison Coal Corp. v. Altmire, 215 Ky. 283, 284 S. W. 1068. Such questions which include facts of which there has been no proof are improper and subject to objection. C., N. O. & T. P. Ry. Co. v. Ross, 212 Ky. 619, 279 S. W. 1075; Coreene De Donato, Respt., v. Rolla Wells, 328 Mo. 448, 41 S. W. (2d) 184, 82 A. L. R. 1331.

Many, if not all, of the physicians introduced by Williams were asked if an operation would be regarded successful if the doctor performing it should inject infection into the wound during the operation; also, as to what the witness himself would do, in the circumstances, without any reference to the facts proven. Many of the questions invaded the province of the jury and on this ground were objectionable. The trend of the questions was to undertake to elicit a proper practice on the part of the physician or surgeon, different from that which had been shown by the evidence in the case. This method and line of questioning were improper and

prejudicial. Aside from this ground of objection, the questions ignored the general rules as indicated above. Indeed, in the presentment of the evidence to establish his cause of action, seemingly, Williams did so on the hypothesis it was an action to recover damages for a wanton assault, and utterly disregarded the familiar principles and the approved practice in actions for damages for malpractice.

Williams was examined as a witness in chief; cross-examined by Dr. Stacy and the hospital, then re-examined, covering the subject-matter about which he had testified in chief. After the evidence in behalf of the defendants was concluded, Williams again was recalled to the witness stand and re-examined, touching the same subject, and again substantially the same questions were propounded to and answered by him. A similar method of examination was adopted as to Dr. Pierce Martin, Mrs. Martin, and Dr. Combs, and perhaps other witnesses in behalf of Williams. This method of producing and reproducing the evidence by the same witnesses was improper. Also, while Williams was testifying for himself in chief, he exhibited his limb, which was proper, not as evidence of negligence on the part of Dr. Stacy, but as competent evidence of the sum of Williams' recovery, if and when it was proven by the testimony of experts Dr. Stacy was guilty of negligence. Again when his attorney began to make the closing argument, he called Williams, placed him in a chair in front of the jury, re-exhibited his naked limb to the jury, and had him sit with it exposed throughout the argument of over an hour's duration, to which he repeatedly referred and freely commented. This was improper and prejudicial.

The petition states no cause of action against the hospital. Williams neither proved, nor attempted to prove, a cause of action against it. It was entitled to a directed verdict. Black v. Fischer et al., 30 Ga. App. 109, 117 S. E. 103. The fact Dr. Stacy was one of the principal stockholders of the hospital does not render it liable for a negligent and improper treatment of his patient; nor did the fact it was largely under his control and management, render it liable for treatment rendered by him to one of his patients. No fact is alleged in the petition, nor proven, that the hospital undertook to direct Dr. Stacy in the method of treatment or the procedure of the services he rendered Williams. There is no allegation nor proof that Dr. Stacy was either the

agent or servant of the hospital, or that he was acting for it as its agent or by its direction or within the scope of an agent's employment. There is no allegation he was not a skilled surgeon. The precedents in the several courts of the United States seem to be harmonious in their rulings that where a hospital contracts to furnish, and acts in good faith, with reasonable care in the selection of a physician or surgeon, and selects or authorizes one in good standing in his profession, it has fulfilled its obligation and cannot be held liable for his want of skill. We express no opinion of the question of excessive damages.

Wherefore, the judgment is reversed, with directions to award a new trial, and for proceedings consistent with this opinion.