## Mitchell's Adm'x v. Harlan Central C. Co.

(Decided Jan. 28, 1936)

G. G. RAWLINGS and GEO. R. POPE for appellant.

W. T. DAVIS and E. L MORGAN for appellee

OPINION OF THE COURT BY JUDGE REES—Affirming.

Frank Mitchell died suddenly while at work in appellee's coal mine. His wife qualified as administratrix of his estate, and brought this action for damages against his employer, alleging, in substance, that the defendant caused its employee, the decedent, to use an electric motor which it had negligently permitted to become in a defective and dangerous condition, and that he came to his death as the direct and proximate result of such negligence. It was plaintiff's theory that the decedent came in contact with a trolley pole fastened to the side of the motor and charged with 250 volts of electricity, and which the defendant had negligently failed to screen or guard. The defendant had not elected to operate under the provisions of the Workmen's Compensation Act (Ky. Stats. sec. 4880 et seq.). At the conclusion of the plaintiff's evidence, the court sustained the defendant's motion for a di-

rected verdict in its favor, and the plaintiff has appealed.

Whether or not the court's ruling in this respect was correct is the only question presented on this appeal.

At the time of his death, the decedent and his brother, Charlie Mitchell, both experienced miners, were working together on a night shift. They were engaged in cleaning up one of the mine entries, and Charlie Mitchell was operating an electric motor, to which several mine cars were attached. The wheels of the motor slipped, and Charlie Mitchell requested his brother to go to the sand box and spread sand on the tracks in front of the motor. The sand box was located on the front end of the motor and on the left side. Charlie Mitchell was seated on the rear end of the motor and on the right side. The electric power to operate the motor was obtained from an overhead wire charged with 250 volts of electricity. The motor was equipped with a trolley pole about $4\frac{1}{2}$ feet in length, on the end of which was a strip of brass called the "harp," and attached to the harp was a wheel which, of course, was not insulated. At various places in the mine, the trolley pole could not be used on account of sharp curves or narrow entries, and, in lieu of the pole, a hand nip was used. This was a piece of copper wire curved at the end with an insulated handle to it attached to an electric cable, which in turn was attached to the motor. When the motor was being operated by means of the nip, the trolley pole was hooked down on the left side of the motor, and the harp or metal end of the pole then extended to a point about 15 inches from the front end of the motor. There was evidence that the motor was not equipped with a switch for cutting off the power from the trolley pole when the nip was being used, and that at such time the trolley pole was charged with electricity. It was plaintiff's theory that the decedent's body accidentally came in contact with the harp of the trolley pole while he was sanding the tracks in front of the motor.

Another electric motor was on the track a few feet in front of the motor operated by Charlie Mitchell. It had been traveling in the opposite direction, and had been stopped until Mitchell's motor turned off

into a side entry. Roscoe Hickey and Ed Harris were in charge of the electric motor that had stopped, and Hickey was introduced as a witness by the plaintiff. He testified, on cross-examination, that Frank Mitchell was standing near the motor raking sand from the sand box with his right hand. His testimony concerning Mitchell's conduct immediately before the latter's death was as follows:

"Q. What happened? A. All at once he threw his hand up that way and walked away to where Ed Harris was and said 'Oh, Lord have mercy on me' and walked in front of Ed Harris and sat down.

"Q. How for did he walk? A. 10 or 15 feet.

"Q. Say anything while walking? A. No sir.

"Q. Say anything more after he sat down? A. Yes sir, he prayed.

"Q. What was he saying? A. 'Oh Lord, Oh Lord, have mercy on me.'

"Q. How long did he sit there and pray, as you say? A. 10 or 15 minutes.

"Q. What were you and Ed Harris doing? A. Ed told me to pour some water on his face and I dashed some on his face."

He further testified that Charlie Mitchell was sitting in the deck of the motor while his brother was raking the sand from the sand box, and that the nip was not on the overhead trolley wire, and that consequently no electric current was in the motor or trolley pole.

Charlie Mitchell testified that, when his brother put his hand in the sand box, he said: "Take the nip off the wire." The witness removed the nip from the trolley wire, and his brother staggered over and fell on the track. He lived three or four minutes. He stated that his brother's body, probably his breast, came in contact with the harp of the trolley pole, which was charged with electricity, but he admitted that he could not see what actually happened, and that he deduced these facts from his brother's exclamation: "Take the nip off the wire." He assumed that his brother came in contact with the harp of the trolley

pole, and that it was charged with electricity, from the fact that the decedent made the quoted statement and immediately staggered away from the motor.

Dr. M. W. Anderson testified that a person receiving 250 volts of electricity would be killed almost instantly, and that he would not be able to speak or make the statements attributed to the decedent. He, and other witnesses introduced by the plaintiff, stated that a current of electricity sufficient to cause death produces a wound or burn at the point of contact which can be seen. The undertaker and other witnesses who examined Mitchell's body stated there were no wounds or burns on it. The testimony of plaintiff's own witnesses leaves the cause of Mitchell's death a matter of conjecture and doubt.

The evidence on the question of appellee's negligence in equipping and operating the electric motor was conflicting, and it may be conceded that the evidence on this point was sufficient to take the case to the jury, provided that there was some substantial evidence that such negligence was the proximate cause of the decedent's death. The testimony of Charlie Mitchell amounts to no more than a supposition that his brother was electrocuted by coming in contact with the trolley pole, which he assumes was charged with electricity. As was stated in Louisville & N. R. Co. v. Mann's Adm'r, 227 Ky. 399, 13 S. W. (2d) 257, 258:

"A supposition is a conjecture based on the possibility that a thing could have happened. It is an idea or a notion founded on the probability that a thing may have occurred, but without proof that it did occur."

The testimony of other witnesses refutes the probability that the decedent could have acted as he did if a current of electricity of the voltage claimed had passed through his body. Sudden deaths, from heart disease and other causes, of persons apparently in good health, are frequent. Such a theory is more in accord with the evidence in this case than the theory that the decedent was electrocuted. The exclamation of the decedent, testified to by his brother, of which so much is made, was a natural one if he became ill suddenly while standing near the motor, which might start to move at any moment. Under the evidence, one

is left to theorize as to the cause of his death. A recovery cannot be had on speculation as to how the death complained of occurred. The general principle is thus stated in Tolin v. Terrell, 133 Ky. 210, 117 S. W. 290, 291:

> "While it is true that the question of proximate cause is ordinarily one for the jury, yet, where the evidence connecting the plaintiff's injuries with the defendant's alleged negligence amounts to mere speculation or conjecture, no case for the jury is presented."

That principle has been applied in numerous cases; a few of the more recent ones being Kentucky Utilities Co. v. Wiggins, 254 Ky. 629, 72 S. W. (2d) 12; Spencer's Adm'r v. Fisel, 254 Ky. 503, 71 S. W. (2d) 955; City of Ludlow v. Albers, 253 Ky. 525, 69 S. W. (2d) 1051; Fordson Coal Company v. Whitt, 253 Ky. 484, 69 S. W. (2d) 992; Stacy v. Williams, 253 Ky. 353, 69 S. W. (2d) 697; Park Circuit & Realty Co. v. Ringo's Guardian, 242 Ky. 255, 46 S. W. (2d) 106; Cochran's Adm'rs v. Chesapeake & O. R. Co., 232 Ky. 107, 22 S. W. (2d) 452.

We conclude that the trial court properly directed a verdict for the defendant.

The judgment is affirmed.