## Elcomb Coal Co. v. Gray's Adm'x.

(Decided Feb. 15, 1938.)

C. B. SPICER for appellant.

GOLDEN & LAY for appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Reversing.

A judgment for $4,500 in favor of Jasper Gray's administratrix was rendered in the Harlan circuit court against the Elcomb Coal Company, a corporation, from which it appeals.

It relies upon a number of grounds for reversal, but its counsel emphasizes only the following as the chief ones, practically waiving all others:

"(1) Because the evidence shows that the deceased was not an employee of the appellant, but was an independent contractor and working for himself; (2) because the evidence fails to show that the deceased was injured at all or that he died of any injury; (3) the evidence fails to show any negligence on the part of the appellant that proximately caused his death or any injury to him."

We will discuss first the second and third grounds together Jasper Gray entered into a contract with appellant by the terms of which he agreed to remove or take slate rock out of its mine for $2.75 and $3 a yard, furnishing and paying for the labor himself, necessary in removing the slate rock. The facts on which the action is found are uncertain, indefinite, and

speculative. If the death of appellee's deceased was caused by the injury while engaged in removing the slate rock, no witness was willing to state how it occurred or what the injury definitely was. Alvin Sharp, who was working with Gray, is the only witness who stated anything concerning what happened at the time of the alleged injury. Appellant insists that Gray's death resulted alone from a cerebral hemorrhage or high blood pressure and not from any injury resulting from an electric shock, or, if caused from injury resulting from an electric shock, it was not on account of any negligence of appellant, its servants or employees. A solution of those questions will settle the case. A paucity of any direct testimony is apparent.

On the occasion of Gray's injury he was operating and riding in a deck of an electric motor moving a compressor or jack hammer which he had obtained for the purpose of drilling a shot for more slate rock. The compressor was in front of the motor. Sharp was riding on it. The motor was on the main track in the mine. In moving they had gone about 35 feet from the frog of the track. In going to get the compressor, the trolley pole was in the rear of the motor. The compressor was on the third entry. They went below the switch with the motor and stopped. They then pushed the compressor out on the main track and coupled it on to the motor. After they had coupled on to it, Gray started his motor and moved on to the place where he intended to use the compressor. In doing so, he did not change the trolley pole. Consequently, the trolley pole was in front of the motor. After moving 30 or 35 feet from the frog, Sharp, riding with his back to Gray, heard Gray "holler" and say: "Brother, I am killed." He then looked back and by the time he got off of the compressor to the ground, the motor stopped. He then went to Gray and found him in the deck leaning toward the bumper with his miner's cap on and the carbide lamp on his cap burning. The trolley pole was lying across his shoulders and disconnected with the wire. There was no jerking of the motor at any time or any noise or spark caused by a short circuit of the current. The trolley pole had no electricity in it. Sharp removed it from the shoulders of Gray. After doing so, he then assisted Gray from the motor. He took hold of Gray's arm and they walked about 232 feet away from the motor, when Gray went down and could

walk no farther. As he walked, he said again: "Brother, I am killed." Sharp further stated that it was more dangerous to head the trolley pole than it was for it to follow; that Gray knew that fact; that it was a rule of the company that the trolley at all times should be behind the motor and not in front; that at the time Gray made the exclamation: "Brother, I am killed," the motor was between two entries about 50 feet from the one they had passed, and about 100 feet to the next entry. Sharp saw nothing to indicate that electricity caused the death of Gray. He could not and did not state what caused Gray to cry out he was killed. The only thing he saw was some blood coming from Gray's nose and mouth and possibly his ears as they walked away. The trolley pole was insulated. Sharp took hold of it with his hand and moved it and it was not in connection with any charged wire. When the body was examined immediately after his death, there was no evidence of injury discovered except a sore on the back of his left hand between the thumb and front finger. The undertaker who prepared the body for burial stated that it was an old sore; that it had a scab upon it which he removed, cleaned it out, and filled the place with some substance that he might properly embalm the body. Bill Qualls, a witness for appellant, stated that he took off a glove from the deceased's left hand; that to do so he had to cut the rubber that held the glove off his hand; that when he took it off it had no holes in it; was not burned or in any way affected by anything that indicated it had been burned. However, witnesses for appellee stated that the glove which was on his left hand had the appearance that the part of the glove that would cover the hand over the sore place was burned through, making a hole in it that was as large as a 25 or 50 cent piece; that the place on the glove over the sore place on the left hand indicated it had been freshly burned. Bill Qualls stated that the glove that was testified about by witnesses for appellee was not in that condition when he took it from the deceased's left hand. Drs. H. K. Buttermore, W. R. Parks, and W. P. Cawood, witnesses for appellant, gave evidence that on examination and from hypothetical questions asked them that in their professional opinion the cause of the death was not an electric shock, but was from a cerebral hemorrhage. On the other hand, Dr. Charles B. Stacy, a witness for appellee, gave evidence

that he examined the body after death, made an autopsy, found the organs of the body normal, and there was nothing to indicate a cerebral hemorrhage or heart trouble. In his. professional opinion he stated that the death was caused from an electric shock. Dr. Buttermore further stated that heart trouble was the cause of the bleeding of the nose, mouth, and ears. Dr. Stacy undertook to account for the bleeding by saying that the deceased might have struck his head against some object when he received the shock that produced the bleeding.

This evidence is not enough to authorize a submission of the case to the jury. There must be some other evidence that the death of the deceased was not only attributable to an electric shock, but that it was attributable to the negligence of appellant and not the result of Gray's negligence. Counsel for appellee fully realized that point; therefore, it is insisted that appellant violated section 2739-33, Kentucky Statutes, in failing to comply with that statute by covering and protecting its live electric wires, as the statute provides. That section, in part, is as follows:

"On all haulage roads, landings and partings, where men are required to regularly work or pass under trolley or other bare power wires which are placed less than six and one-half feet above top of rail, a suitable protection shall be provided. This protection shall consist of channeling the roof, placing boards along the wires, which shall extend below it, or the use of other approved devices that afford protection."

It is the rule of this court that a case must be submitted to the jury if there is any evidence to sustain the cause of action on which an issue is joined. In determining that question, the court views the evidence in the aspect most favorable to the complaining party. By the term "evidence" is included the facts proven and the inferences reasonably deducible therefrom. But a decision may not be rested upon unreal or remote inferences. A pyramiding of inferences is not regarded as sound reasoning, and is not a permissible predicate for a conclusion. The proven facts and legitimate inferences drawn therefrom must be something of substance and relevant consequence, carrying the quality of proof, and having fitness to induce conviction. Dos-

senbach et al. v. Reidhar's Ex'x et al., 245 Ky. 449, 53 S. W. (2d) 731, and cases cited therein. This court has also said that a submission of a case to the jury will not be authorized where the verdict rests solely upon a guess or surmise or mere speculation. Fee's Adm'x v. Mahan-Ellison Coal Corp., 241 Ky. 231, 43 S. W. (2d) 681. Negligence in the relation of master and servant is a failure of the master to observe some duty that he owes the servant. Horse Creek Mining Company v. Frazier's Adm'x, 224 Ky. 211, 5 S. W. (2d) 1064. To recover for personal injuries or for death to a servant, it must be shown that the master owed the servant a duty which he failed to perform, and that but for its failure the injury or death would not have resulted. Hewitt Lumber Company v. Cisco, 186 Ky. 635, 218 S. W. 296. The question of proximate cause is ordinarily one for the jury, yet, where the evidence connecting the plaintiff's injuries with the defendant's negligence amounts to mere speculation or conjecture, no case for the jury is presented. Tolin v. Terrell, 133 Ky. 210, 117 S. W. 290, 291; Mitchell's Adm'x v. Harlan Central Coal Company, 263 Ky. 702, 93 S. W. (2d) 347. In view of these fundamental rules, the court is of the opinion that the evidence in the instant case falls far short of showing that the negligence of appellant was the proximate cause of the death of appellee's deceased.

The evidence of Sharp, the only witness who could know anything of the alleged injury, furnishes no proof of any negligence or failure on the part of appellant in observing any duty that it owed appellee; but, on the other hand, his evidence does show that, if the trolley pole had been trailing and not heading and should have become disconnected with the charged wire, no injuries would have occurred; and, further, it is in evidence that, if the trolley pole had been following and a short circuit had occurred, a disconnection would have resulted at once. There was no flash or spark from the wire, which always follows when there is a short circuit. It is common knowledge from observation and common experience that a flash or spark inevitably follows a short circuit. The witness Sharp positively and unequivocally states that he did not know from what he saw and heard what caused the death of Gray. The only statement of what might have been the cause of his death is that of Dr. Stacy, a witness for appellee,

who knew the deceased, examined the body after his death, made an autopsy, and stated as his professional opinion that he attributed the death to an electric shock and further gave as his opinion that, a man, after receiving an electric shock sufficient to kill him, might be able to speak and walk as in the instant case. Such evidence in our opinion is certainly speculative and opposed to the laws of nature and the common experience and observation of the court. If a current of 275 volts, which the proof shows was in the wires of appellant, had passed through the deceased when coming in contact with him, death would have been immediate and sudden. Every particle of the deceased's body would have been paralyzed as well as his tongue and brain. A professional opinion of that character is of no probative value.

The evidence is conclusive that the deceased not only talked and walked, but at the time was bleeding from the nose, mouth and ears, which necessarily follows that a reasonable solution of the cause of his death would be a cerebral hemorrhage. It is common knowledge that a cerebral hemorrhage is sudden and without warning. No recovery can be had against a master from inferences and opinions of physicians unless the cause of the death cannot be explained on any other inference or hypothesis other than negligence. In the instant case there is no evidence as to just how the alleged injury occurred, but there is positive evidence to the effect that the deceased had been treated for high blood pressure; that at the time complained of he spoke, walked, and bled at the nose before death; that the wound on his hand was found to be an old one covered by an old scab. It is reasonable to conclude that the death was from a cerebral hemorrhage, but not reasonable that it was caused by a current of electricity. In the instant case, if enough electricity necessary to propel a motor had touched any part of the body of the deceased, it would have caused his death immediately and at once. The statute relied on only required a protection of the wire by channeling the roof and placing boards along the wires to extend below the wire where men are required to regularly work or pass under a trolley pole in a place less than 6½ feet above the top of the rail on all haulage roads, landings and partings.

The evidence is to the effect that when Gray made the announcement that he was killed, that the motor

was on the haulage road, but, under the statute, the protecting of the electric wire was to be only where men were required to work regularly or pass under a trolley. There is no evidence that at the point where the deceased was he was required to go under the trolley line or under any exposed wire. It is in evidence that the trolley line was 4 inches at least to the right of the track, and the deceased was not required, nor did he have any business in operating the motor, to pass under the trolley line. There is no evidence that if the deceased was under the trolley that it was there he received the shock. When found, the trolley pole was on his back and not connected with any live wire. The only injury relied upon from the evidence was the sore upon his hand. No other conclusion can be reached, than if this injury was caused by electricity, that the deceased received it not in the performance of his duty in operating the motor, but he must have reached out and up to the right of the motor, and in that way negligently and carelessly took hold of the live wire, thereby receiving the shock. If he received it in that way, then his own negligence would have been the proximate cause of the injury. The only reasonable and plausible conclusion that can be reached is that his death was the result of a cerebral hemorrhage or from high blood pressure. The evidence of Dr. Buttermore is positive and undenied that six weeks before the death of the deceased he treated him for hypertension; that at the time his blood pressure was from 180 to 200; that at another time, about five or six days before his death, he treated him for the skinned place that he had on his left hand; that he examined it and gave the deceased a bottle of antiseptic—tincture merthiolate; that after his death he saw the same sore and at the same place and saw the undertaker remove the scab in preparation for embalming the body.

We cannot escape any other conclusion than that the trial court erred in not peremptorily instructing the jury to find for the defendant. Having reached that conclusion, nothing would be accomplished in considering the other alleged errors.

Wherefore, the judgment is reversed, with further proceedings consistent with this opinion.