**ERMIN v. PENNSYLVANIA R. CO.**
Civil No. 1119.

District Court, E. D. New York.
January 8, 1941.

John C. Robinson, of New York City (Morris A. Wainger, of New York City, of counsel), for plaintiff.

Burlingham, Veeder, Clark & Hupper, of New York City (G. Hunter Merritt, of New York City, of counsel), for defendant.

MOSCOWITZ, District Judge.

There is one question presented to the Court for its consideration, that is, whether or not plaintiff at the time of the accident, in which he sustained injuries, was engaged in interstate commerce.

The parties have entered into a written stipulation of all the facts, as follows:

"1. The Pennsylvania Railroad Company is and was at the times complained of a common carrier by railroad, at least two-thirds of whose business is in interstate commerce.

"2. From November 1, 1939 to and including January 12, 1940, plaintiff was a brakeman in defendant's employ as a member of an extra shifting crew assigned each day to the movement of engines and cars, freight and merchandise, his wages being paid semi-monthly.

"3. Under orders given in the morning of January 12, 1940 for the entire day's work, plaintiff and his crew moved three dead engines from Altoona, Pa., to Hollidaysburg, Pa. to be held there until orders should be given for their repair, and after the accident they moved three dead engines from Hollidaysburg, Pa. to the shop tracks at Altoona, Pa., which had been ordered there for repairs under circumstances hereinafter set forth. Plaintiff was injured in the morning on the way to Hollidaysburg.

"4. Plaintiff was employed in interstate transportation or commerce, on the following dates:

"November—1, 2, 4, 5, 6, 7, 11, 12, 14, 15, 16, 17, 19, 21, 22, 23, 24, 25, 27, 29 and 30, 1939;

"December—1, 2, 4, 5, 6, 8, 9, 10, 12, 13, 15, 16, 18, 20, 22, 23, 24, 26, 27, 28, 29 and 31, 1939;

"January—1, 3, 5, 6, and 10, 1940.

"5. On November 3 and 9, 1939, plaintiff was engaged in moving defendant's own empty system cars, from its yards at Altoona, Pa. to its yard at Hollidaysburg, Pa. for storage, and from its yard at Hollidaysburg to its Altoona repair shops. All these cars were to be repaired at its car repair shops at Altoona. Those that were moved from the Altoona yard to the Hollidaysburg yard were to remain there until ordered to be taken back to the Altoona repair shop tracks to be repaired, those that were moved from Hollidaysburg to the car repair shops in Altoona were cars that had been ordered to be placed in repair and would be returned to service upon completion of repairs. When the repairs were completed, each car was to be used in both interstate and intrastate transportation and commerce, as from time to time assigned.

"6. On November 10, 1939, plaintiff and his crew were engaged in hauling engines between the same points and for the same purpose as on January 12, 1940, hereinafter more fully described in Paragraphs 8 to 14.

"7. On November 18, 1939, and on January 8 and 11, 1940, plaintiff was engaged in moving cars loaded with Company material from defendant's Altoona yard to its Hollidaysburg yard and from Hollidaysburg to its Altoona shop yard. The material had arrived at Altoona consigned to defendant's shops for use therein. Some of the cars had come from outside the State of Pennsylvania and some from within the State. On arrival of such loaded cars at Altoona, in accordance with usual custom, the storekeeper of defendant's shops was notified of

their arrival and, as there was no space in the Altoona yards or shops in which to keep said cars until their contents could be unloaded or used, he directed them to be taken to Hollidaysburg to be kept in defendant's yards there, and they were accordingly moved to said Hollidaysburg yard and remained there until further orders were received ·from said storekeeper that they be brought from Hollidaysburg to Altoona for use or unloading at the shops.

"8. On January 12, 1940, the plaintiff was engaged as brakeman in moving defendant's engines, which had been out of service for repairs for several months, from its Altoona yard to its Hollidaysburg yard, where they were to be held until orders should be given to take them to Altoona to be repaired; after which repairs they would be returned to service. After the accident to plaintiff he and his crew also moved from Hollidaysburg to Altoona, by means of Engine No. 9912, defendant's dead engines numbered 1555, 3514 and 5436, the facts concerning which are stated in the following paragraph. On this day, engine 9912 was assigned to and was used by plaintiff and his crew for their entire day's work from 6:00 A. M. to 2:30 P. M.

"9. Defendant's practice with respect to the use and movement of such engines as were being moved on January. 12, 1940, was as follows:

"The defendant Railroad, for operating purposes, is divided into three regions, the Eastern, Central and Western. Each region is divided into a number of divisions. All engines are assigned to divisions. Within the divisions, engines are assigned to particular terminal yards or roundhouses, and at their terminal yards or roundhouses they are assigned or designated from time to time for particular service. Such assigned service for a particular engine may be the same for a long period of time, or may be changed from time to time or from day to day. Each of these engines is, from time to time used in both interstate commerce and in intrastate commerce, less frequently in the latter.

"When an engine requires repairs, except running repairs which are ·generally made in the roundhouse of its division or terminal, it is taken out of service and, as opportunity offers, is moved to the Middle Division where defendant's Altoona shops are located. Pending the time when the engine is ordered to be repaired for return to service, the engine is hauled to defendant's yard at Hollidaysburg and held. The engines moved by plaintiff and his crew on January 12, 1940, from Altoona to Hollidaysburg were such engines.

"Each month the Road Foreman of Engines of Divisions, Master Mechanics of Divisions, Superintendents of Motive Power of Divisions, General Superintendents of Motive Power of Regions and Chief of Motive Power of the System, after consultations and recommendations, decide, which engines out of service and awaiting repair, including those at the Altoona shops and in Hollidaysburg, are to be placed in the shops during the following month for repair and return to service. The decisions as to particular engines are based on the number, kind, condition and mileage of the various engines awaiting repair and those in actual service, on the number and kind of locomotives stored in good order, the probable locomotive needs of the railroad and the regions based on the business outlook, the requirements for a particular type of locomotive, and the funds available for repairs.

"After the decision has been made as to particular engines, the Chief of Motive Power notifies the Works Manager of the Altoona Shops from time to time which particular engines are to be repaired for return to their terminals for service on completion of repairs. After receipt of said orders to repair a particular engine, if the engine is at the Hollidaysburg yard, orders are issued by the Works Manager to have it brought to the Altoona shops.

"10. In accordance with the aforesaid custom the Chief of Motive Power had directed the Works Manager of the Altoona Shops, a day or two before January 12, 1940, to repair engines 5436, 3514 and 1555 on the February, 1940 budget. On January 12, 1940, the Works Manager of the Altoona Shops ordered these three engines brought to the shop tracks from Hollidaysburg. They were the engines which plaintiff and his crew moved from Hollidaysburg to Altoona on January 12, 1940.

"These engines were being moved for the purpose of being repaired and returned to active service in their divisions, the general nature of which service is described in paragraph 9.

"11. Engine 1555 had been withdrawn from service April 25, 1939 at Philadelphia, Pa., forwarded to Altoona on May 8, 1939 and held in the Hollidaysburg yard until it was brought to the Altoona shop track on

January 12, 1940. It was taken into the shops on January 16, 1940, where it was substantially dismantled for heavy repairs and was turned out on February 26, 1940. On February 28, 1940, it went to the Altoona engine house to be broken in, and it left Altoona on March 1, 1940 for Philadelphia, Pa., running light, and on March 7, 1940 was assigned to and took out an interstate train.

"12. Engine 3514 had been withdrawn from service at Shire Oaks, Pa., March 5, 1939, arrived at Altoona on September 12, 1939, and was stored at Hollidaysburg until it was brought to the Altoona shop track on January 12, 1940. It was taken into the shops on January 16, 1940 where it was substantially dismantled for heavy repairs and was turned out February 2, 1940. On February 5, 1940, it went to the East Altoona engine house to be broken in. It left Altoona for Pitcairn, Pa., running light on February 5, 1940, and on February 7, 1940 was assigned to and commenced work as a yard shifter for moving and shifting cars and trains in both interstate and intrastate commerce.

"13. Engine 5436 had been withdrawn from service February 6, 1939, at Harrisburg, Pa., arrived at Altoona, on January 11, 1940 and was sent to Hollidaysburg until brought to the Altoona shop tracks on January 12, 1940. It was taken into the shops on January 13, 1940, where it was substantially dismantled for heavy repairs. Since completion of these repairs it has been used at Altoona by the Locomotive Test Plant for testing a new type valve to determine whether such valves should be adopted by the defendant on its engines.

"14. Engine 9912 was withdrawn from service at Canton, Ohio, March 2, 1938, arrived at Altoona on October 23, 1939, and was held at Hollidaysburg until taken into the shop on December 12, 1939 for heavy repairs. It was assigned to the Conemaugh Division on December 30, 1939 because it was equipped with automatic cab signals which are used on certain parts of the railroad. It was turned out from the shop on January 11, 1940 and it was being broken in on January 12, 1940 to test the repairs that had been made. The test consisted of active road service and the engine was assigned to the plaintiff and his crew for their work that day. On January 12, 1940 at 9:40 p.m. the engine left Altoona, running light, to Pit-

cairn, Pa., in the Conemaugh Division, where it entered active service in both interstate and intrastate commerce. On January 15, 1940 at 4:30 a. m. it was used to move a local freight train carrying both interstate and intrastate freight."

The parties have consented that the Court determine the question of whether or not the plaintiff was engaged in interstate commerce, prior to the trial. The Court is willing to comply with the request of the parties. Happily the question can be disposed of under the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. This is another illustration of the wisdom of the rules.

The parties could insist upon the trial of the issue of interstate commerce before a jury, as that is one of the material issues of the complaint, however, when the facts are not in dispute it is far better to submit the matter to the Court in the absence of the jury so as to avoid confusing the jurors.

If the facts had not been stipulated the trial of the action would have been unduly prolonged as most of the testimony in the case would relate to the question of interstate commerce.

The question to be answered is whether or not the plaintiff at the time of his accident was employed in interstate commerce within the purview of the Federal Employers' Liability Act as amended by the Act of Congress, approved August 11, 1939, Public—No. 382—76th Congress, Chapter 685, 1st Session, S. 1708, 45 U.S.C.A. § 51 et seq.

Chapter 685 amends Sections 1, 4 and 6 of the Federal Employers' Liability Act (45 U.S.C.A. §§ 51–59) and adds a new Section 10, 45 U.S.C.A. § 60. It extends the scope of employment embraced in the Federal Employers' Liability Act (Section 1), it abolishes the defense of assumption of risk (Section 4), it extends the period within which an action may be brought from two to three years (Section 6), and prohibits any interference with the voluntary furnishing of information to a person in interest as to the facts concerning the injury or the death of any railroad employee (new Section 10). The pertinent portion of Chapter 685 with which we are now concerned is with the amendment to the first section. This new Act defines what is meant by employment in interstate commerce, as follows: "Any employee

of a carrier, any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this Act, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this Act and of an Act entitled 'An Act relating to the liability of common carriers by railroad to their employees in certain cases' (approved April 22, 1908), as the same has been or may hereafter be amended."

The facts are sufficiently set forth in the stipulation, they will not be repeated.

This case involves the construction of the Federal Employers' Liability Act as amended by the Act of Congress, approved August 11, 1939. The Court is informed that there are no reported decisions construing this amendment.

■ The discussions in Congress indicate that it was the intent of the lawmakers to bring within the scope of the Federal Employers' Liability Act all employees whose work at the time of injury was not in actual interstate transportation or a part of it, but any part of whose work was in furtherance of interstate commerce, or in any way affected such commerce directly, closely and substantially. The bill, as introduced in the Senate, provided that an employee was to be considered as engaged in interstate commerce if his duties "in any way" affected interstate commerce. At one of the hearings before a Sub-committee of the Committee on the Judiciary of the Senate, the Committee, at the suggestion of Senator Austin, amended this provision by substituting the words "or in any way directly, or closely and substantially affect such commerce." Senator Austin said: "Now, on page 2, line 18 and 19, occur the words 'or in any way'. Unless I am convinced I ought not to do that for some good reason, I think I will move to substitute for those words that occur and recur in many cases of recent date as defining what kind of effect on interstate is comprehended by the commerce clause of the Constitution. Those are the words, 'directly, closely and substantially'. I would substitute those words for the words 'or in any way' ".

And again: "Senator Austin: My amendment was to substitute for the words 'or in any way' the words 'directly, closely and substantially.' That is the law as it is interpreted by the Supreme Court of the United States in National Labor Relations Board against Jones & Laughlin Steel Corporation [301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352]; in the Bituminous Coal Conservation Act of 1935, in connection with N.R.A. Codes, and in Carter versus Carter Coal Co., and others [298 U.S. 238, 56 S.Ct. 855, 80 L.Ed. 1160]."

It developed at many of the trials of actions brought by railroad employees that they were not informed by the railroad whether or not at the time of the accident they were actually engaged in interstate commerce, and as a matter of fact few of them knew at the moment when the accident occurred whether they were engaged in interstate or intrastate commerce.

■ There are multitudinous decisions raising hair-splitting interpretations as to whether or not the employee at the time of his accident was actually engaged in interstate commerce. It was to avoid this difficulty that Congress enacted the amendment. It was, undoubtedly, the intent of Congress to include within the scope of the Federal Employers' Liability Act all employees, even those performing intrastate services whose employment meets the requirements of the Act. It is no longer subject to doubt that Congress had the power to include intrastate employment, which affects interstate commerce, within the scope of the Federal Employers' Liability Act. See Southern R. Co. v. United States, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72; Texas & P. R. Co. v. Rigsby, 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874; Baltimore & O. R. Co. v. Interstate Commerce Commission, 221 U.S. 612, 31 S.Ct. 621, 55 L.Ed. 878; National Labor Relations Board v. Fainblatt, et al., 306 U.S. 601, 59 S.Ct. 668, 83 L.Ed. 1014; Illinois Cent. R. Co. v. Behrens, 233 U.S. 473, 34 S.Ct. 646, 58 L.Ed. 1051, Ann.Cas. 1914C, 163.

■ The Court should not by a strained construction override the intent of the Congress but should rather decide questions in accordance with the views expressed by the Congress. Here the Congress was trying to remedy a fault, it was enacting legislation which would not require a railroad employee to draw a hairline to determine whether or not at the moment of the accident he was actually

engaged in interstate commerce. The Congress was correcting an evil which existed which prevented railroad employees from receiving a just determination of their rights.

 From the facts stipulated and construing the amendment liberally, as it should be construed, the plaintiff at the time of the accident was engaged in interstate commerce. The motion of the defendant for judgment will be denied.

The action will be restored to the civil jury calendar for trial of the other issues involved in the case.

Settle order on notice.