(No. 7150. February 25, 1944.)

REUBEN MOSER, Respondent, v. UNION PACIFIC RAILROAD COMPANY, a corporation, Appellant.

[147 Pac. (2d) 336.]

Order for Withdrawal of Petition for Rehearing Granted April 10, 1944.

L. H. Anderson and H. B. Thompson for appellant.

Elam & Burke and Clarence L. Hillman for respondent.

BUDGE, J.—This is an appeal from an award made by the Industrial Accident Board in favor of respondent. *Inter alia,* the following appears from the findings of fact:

"That on July 16, 1941, the claimant Reuben Moser, was employed by the defendant, Union Pacific Railroad Company, a corporation, as a laborer at or near Nampa, Canyon County, State of Idaho. That while so working on said date he suffered an injury. That at said time claimant was a married man with a dependent wife and two minor children under the age of eighteen years. That he was then earning an average weekly wage of $20.64.

\* \* \* \*

"That due to the increase in both interstate and intrastate transportation by rail, to facilitate the making up and switching of its trains, to relieve the congestion of traffic in the yard at Nampa, Canyon County, Idaho, and generally to increase the efficiency of its operations, the said defendant, during the month of April, 1941, caused plans to be prepared by its chief engineer for a rearrangement and extension of the said Nampa yard, providing for the installation of new tracks, switches and other facilities, the taking

up or replacing, relocating and relaying of old tracks, switches and other facilities, and in general a plan of construction and reconstruction to enlarge said yard. *That said project called for the excavating for and construction of approximately four miles of new tracks and thirty-two new switches, the building of a new large icing dock about 900 feet long, and the relocating of tracks and switches to make room for the new icing dock.*

"That pursuant to said plan, construction on said project was started May 27, 1941. From the commencement of construction to July 19, 1941, the part of the yard under construction and reconstruction, *'the new part,' was closed to traffic and was not kept in service,* although connected by switches with the portion of the yard which was kept in service. On said last mentioned date the new and reconstructed portion of the yard was opened to traffic, but the project was not finished until about August 23 of the same year." (Italics ours.)

The board further found that the first four or five days respondent worked at relocating tracks; that thereafter up and until July 16, 1941, the date of the accident, respondent worked on new construction, by "helping to carry and lay ties and rails, align them, and to shovel and level gravel"; that his duties were wholly in the construction and reconstruction including the new part of the Nampa yard, to be at some future time, when completed, put into service by the railroad company. So we come to the question of whether respondent in working on the construction, which included the new part, which when completed would be used in both interstate and intrastate commerce, was engaged in employment which entitled him to the benefits of the Federal Employers' Liability Act as amended exclusively, and rendered the Industrial Accident Board without jurisdiction.

On July 16, 1941, respondent while working in the Nampa yard project and while shoveling gravel, sustained a serious injury by accident to his back resulting in a severe pain from which he collapsed and fell in a fainting condition between the tracks of Track No. 118, which was new construction and not in service; neither was the balance of the project in service or being used for either interstate or intrastate commerce. As a result of said injury, respondent was totally disabled for work from the date of the accident, July 16, 1941, to October 1, 1942, except intermit-

tently for short periods of time, and he constantly suffered pain to such an extent that he was unable to carry on his usual employment. The board found respondent's total "disability ended, as of October 1, 1942," but that "he is permanently disabled as a result of his said injury and that the degree of such disability is comparable to 20% of the loss of one leg by amputation at the hip."

Based on its findings of fact, the board made among others the following ruling of law:

"That claimant's duties between the time of his employment by the defendant common carrier on June 2, 1941, and the time of his said injury and accident were not in furtherance of interstate or foreign commerce, and did not in any way directly or closely and substantially, affect such commerce; but that his duties were wholly in the construction of railroad property to be at some future time, when completed, put to such service, and, while said property when completed, became a direct instrumentality of interstate commerce, claimant's duties in connection therewith involved merely a secondary relation to an interstate instrumentality."

The board also ruled that respondent was entitled to an award against appellant for compensation under the Workmen's Compensation law of this state. In other words, that his right to recover compensation for such injury by accident was not governed, and restricted to the Federal Employers' Liability Act as amended.[1]

---

[1]"Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, or between the District of Columbia and any of the States or Territories, and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appli-

As stated in appellant's brief, only two questions are here presented. First, did the board have jurisdiction? Second, do the findings of fact by the board support as a matter of law the order and award?

To determine whether or not the board had jurisdiction we must determine from the facts as disclosed by the record (1) was respondent at the time of his injury engaged in interstate or intrastate commerce, or were his duties as such employee in furtherance of interstate or foreign commerce; or (2) were his duties or the work he was performing at the time of his injury in any way directly or closely and substantially affecting interstate commerce? We think that it is substantially established that appellant's yards at Nampa, where the work was being carried on, were not being used at the time of respondent's injury, July 16, 1941, in either interstate or intrastate commerce, or at all. Neither do we think that in view of the magnitude of the work being done that it can be logically contended that it was but repair work. It is conceded that part of the work being done was new construction. It is further clearly established that at the time respondent sustained the injury, he was engaged in new construction. As testified by appellant's witness, Scott, foreman, who made the following answers to the following questions:

"Q. Now, this line on which he was working at the time he was injured, the entire line had been laid and excavated and new ties put in?

"A. Yes, they just built it.

"Q. And new rails laid on the new ties?

"A. Yes.

"Q. And that had been built prior to the time the rails were laid?

"A. Yes."

---

ances, machinery, tracks, road-bed, works, boats, wharves, or other equipment.

"*Any employee of a carrier any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce as above set forth shall, for the purposes of this chapter be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter.*" (45 U. S. C. A. 51.) (Italic paragraph is 1939 amendment.)

As will be observed, the primary argument upon the part of appellant, turns upon the question of whether the case comes within the Federal Employers' Liability Act as amended; and to support the contention that it does, appellant cites and relies upon the following cases: *New York Cent. R. Co. v. Porter,* 249 U. S. 168, 63 L. Ed. 536; *New York Cent. R. Co. v. Winfield,* 244 U.S. 147, 61 L. ed. 1045; *Philadelphia B. & W. R. Co. v. Smith,* 250 U.S. 101, 63 L. Ed. 869; *La. Ry. & Nav. Co. v. Williams,* (5 Cir.) 272 F. 439; *Hulse v. Pac. & I. N. Ry. Co.,* 47 Ida. 561, 277 P. 426; *Prader v. Pa. Ry. Co.,* (Ind.) 49 N.E. (2d) 387; *Ermin v. Pa. R. Co.,* 36 F. Supp. 936; *Louisville & N. R. Co. v. Potts,* (Tenn.) 158 S.W. (2d) 729; *Wright v. New York Cent. Ry. Co.,* 33 N.Y. Supp. (2d) 531; *Piggue v. Baldwin,* 154 Kan. 708, 121 P. (2d) 183; *So. Pac. Co. v. Ind. Acc. Comm.,* 19 C. (2d) 271, 120 P. (2d) 880; *No. Carolina R. Co. v. Zachary,* 232 U.S. 248, 58 L. Ed. 591; *Philadelphia & Reading R. Co. v. Polk,* 256 U.S. 332, 65 L. Ed. 958; *Philadelphia & Reading R. Co. v. DiDonato,* 256 U.S. 327, 65 L. Ed. 955; *U. S. v. Darby,* 312 U.S. 100, 85 L. Ed. 609; *Va. Ry. Co. v. System Fed. No. 40,* 300 U.S. 515, 81 L. Ed. 789; *NLRB v. Jones and Laughlin S. Corp.,* 301 U.S. 1, 81 L. Ed. 893, 108 A.L.R. 1352; *Wickard v. Filburn,* 87 L. Ed. 57; *Erie R. Co. v. Winfield,* 244 U. S. 170, 61 L. Ed. 1057; *Mondou v. N.Y., N.H. & H.R. Co.,* 223 U.S. 1, 56 L. Ed. 327; *Copley v. Ind. Acc. Comm.,* 19 C. (2d) 287, 120 P. (2d) 879; *Agostino v. Pa. R. Co.,* 50 F. Supp. 726; *McFadden v. Pa. R. Co.* (N.J.), 34 A. (2d) 221; *Shanks v. U. P. Ry. Co.,* 155 Kan. 584, 127 P. (2d) 431. An examination of the authorities cited by appellant discloses that the facts are not parallel to the facts in the instant case. Some of them are hair-splitting, and all of them are decided in the light of their own peculiar facts, and are therefore not controlling in this case. Moreover, a careful analysis of appellant's authorities discloses that none of them holds directly that working upon new construction ultimately to be used in interstate commerce is employment in interstate commerce within the meaning of the Federal Employers' Liability Act as amended; although appellant contends "one cannot find a case more parallel to the case at bar than" *Agostino v. Pa. R. Co.,* supra.

Respondent in maintaining that the case does not come within the Federal Employers' Liability Act as amended cites the following cases: *Raymond v. C. M. & St. Paul R.*

Co., 61 L. Ed. 583, 37 S. Ct. 268; *Louisville & N. R. Co. v. Morgan's Adm'rs.*, (Ky.) 9 S.W. (2d) 212; *Gulf M. & R. W. v. Madden*, (Miss.) 200 So. 119; *Hulse v. Pac. & I. N. Ry. Co.*, supra; *Davis v. Dept. of Labor & Industries*, 317 U.S. ........, 87 L. Ed. 175; *Brotherhood of Railroad Trainmen et al. v. Terminal R.R. Assn.*, 63 S. Ct. 420, 87 L. Ed. 369; *Parker v. Director of Agriculture et al v. Brown*, 63 S. Ct. 30, 87 L. Ed. 235; *Howard v. Illinois Cent. R. Co.*, 28 S. Ct. 141; *Mondou v. N.Y., N.H. & H.R. Co.*, supra; *Shanks v. Del. L. & W. R. Co.*, 60 L. Ed. 436, 239 U.S. 556; *C. & N. W. Ry. Co. v. Bolle*, 52 S. Ct. 59, 76 L. Ed. 173; *Lawrence v. Rutland R.R. Co.*, (Vt.) 28 A. (2d) 488, (Petition for certiorari denied, 87 L. Ed. 294); *Thomason v. Ind. Comm. of Ill.*, 44 N.E. (2d) 19; *Jones v. Loughlin*, 57 S. Ct. 621, 81 L. Ed. 893. There is a most interesting and exhaustive article discussing the question herein involved in 47 Harvard Law Review at page 399.

Respondent makes the contention that working on new construction which will, when completed, be used in interstate commerce, is not employment in interstate commerce within the meaning of the Federal Employers' Liability Act as amended, and cites, among others, the case of *Gulf M. R. W. v. Madden*, supra, from which we quote the following:

"The rule which has been formulated as a result of the foregoing and many other cases is expressed as follows: The service performed must be directly and immediately related to interstate commerce and that relation must be so close or intimate as to make the work then being done by the employe practically a part of such commerce. That the stated rule is subject to what a layman would pronounce as hair-splitting distinctions is illustrated by this: When a railroad employe is engaged in dumping coal into the tender of an engine then or about to be used in interstate service, he is within the Federal Act; but when he is engaged in putting coal into a chute thereafter to be dumped from the chute into the tenders of interstate engines, the service is not within the act. (*Chicago, etc., R. Co. v. Harrington*, 241 U.S. 177, 36 S. Ct. 517, 60 L. Ed. 941.)

"But, the cases are in substantial agreement that employes engaged in the original construction of roadbeds or tracks to be used in interstate commerce are not engaged within the meaning of the statute, while on the other hand those employed in the repair or maintenance of interstate

railroad tracks are within the Act. The difficulty is in applying the distinction between construction and repair to a given state of facts. Ordinarily, what is meant by repairs is that there is a restoration of an originally existing condition, but in practical conduct repairs often involve more or less construction, and a betterment or improvement as compared with the original condition.

"But when the work being done is well beyond any such proportion as may be fairly ascribed to the concept of a repair, then it must go over into the classification as construction. Here the old road bed was practically on a level with the adjacent territory. The old roadbed, for more than half a mile, had been released from the operation of trains for a period of several months, and for more than two months when this accident occurred, and all the trains were being operated over a detour track west of and parallel to the old roadbed. They were not repairing the old roadbed or track, but they were superimposing upon this the old roadbed, a new construction consisting of a fill not theretofore existing which reached at the bridge a height of nine feet, and at this point, and as an essential part of the new work, there was a new bridge, none ever having been there before.

"This enormous and costly project cannot be fairly ascribed to the concept of a repair, and the fact that it was being erected upon the ground previously occupied by the tracks and was to be used when completed for the operation of interstate commerce can have no more effect to make it a repair, rather than construction, than in the cases, *Thomas v. Boston & M. R. Co.*, D.C., 218 F. 143, and *Wright v. Interurban R. Co.*, 189 Iowa 1315, 179 N.W. 877, in which certiorari was denied. 255 U.S. 570, 41 S. Ct. 375, 65 L. Ed. 791.

"In the Thomas case, a roundhouse previously used as an instrumentality in interstate commerce was rendered useless by a fire, and it was being reconstructed at the same spot. It was held that an employee engaged in the process of the new construction was not employed in interstate commerce. In the Wright case, a substation theretofore used as an instrumentality in interstate commerce was being reconstructed, during which time a temporary substation was provided nearby. It was held that a railroad employe engaged in the reconstruction of the original substation was not employed in interstate commerce. We would suppose that if the old substation were only one story in

height and it had become advantageous to the service to add a second and third floor, it would not be contended that in the progress of the work on the two additional stories, the first story being for the time abandoned for use, and employee in that work was engaged in interstate commerce, or in repair rather than construction."

■ Respondent also cites *Raymond v. C. M. & St. Paul Ry. Co.*, supra, wherein it was held that a railway employee, engaged in cutting a tunnel which was not then used, was not engaged in interstate commerce since the tunnel was only partly bored and was not used as an instrumentality of interstate commerce. In *Louisville & N. R. Co. v. Morgan's Adm'rs.*, supra, a member of a railroad construction crew engaged exclusively in blasting operations in constructing a new track, when killed by a flying rock which struck him on the head as a result of an explosion, was held not engaged in either interstate or intrastate commerce. In *Shanks v. Del. L. Y. W. R. Co.*, supra, the court held that the meaning of interstate "commerce" as used in the Federal Employers' Liability Act was limited to mean interstate "transportation", and the test under the act was whether the employee was engaged in interstate transportation at the time of the injury. The Shanks case was cited with approval and reaffirmed by the United States Supreme Court in *C. & N. W. Ry. Co. v. Bolle,* supra, wherein it is said:

"It will be observed that the word used in defining the test is 'transportation', not the word 'commerce'. The two words were not regarded as interchangeable, but as conveying different meanings. Commerce covers the whole field of which transportation is only a part; and the word of narrower significance was chosen understandingly and deliberately as the appropriate term. The business of a railroad is not to carry on commerce generally. It is engaged in the transportation of persons and things in commerce; and hence the test of whether an employee at the time of his injury is engaged in interstate commerce, within the meaning of the act, naturally must be whether he was engaged in interstate transportation or in work so closely related to such transportation as to be practically a part of it.

"Since the decision in the Shanks Case, the test there laid down has been steadily adhered to, and never intentionally departed from or otherwise stated. It is necessary to refer to only a few of the decisions. * * * The rule

announced by the Shanks Case has been categorically restated and applied also in the following cases among others: *Southern P. Co. v. Industrial Acci. Commission*, 251 U.S. 259, 263, 64 L. Ed. 258, 260, 10 A.L.R. 1181, 40 S. Ct. 130; *Industrial Commission v. Davis*, 259 U.S. 182, 185, 66 L. Ed. 888, 891, 42 S. Ct. 489; *Baltimore & O. S. W. R. Co. v. Burtch*, 263 U.S. 540, 543, 68 L. Ed. 433, 436, 44 S. Ct. 165, 24 N.C.C.A. 42. The applicable test thus firmly established is not to be shaken by the one or two decisions of this court where, inadvertently, the word 'commerce' has been employed instead of the word 'transportation'."

▉ It may readily be conceded that a railroad is engaged in interstate commerce when engaged in the transportation of persons and things between the several states or territories, or between any of the states or territories, or between the District of Columbia and any of the states or territories, or between the District of Columbia or any of the states or territories and any foreign nation or nations; and when so operating in interstate commerce a railroad is liable in damages to any person suffering injury, when he is employed by such carrier in such commerce, due to the railroad's negligence.

▉ The rule would seem to be that the jurisdiction of state courts and tribunals should be surrendered only where lack of jurisdiction is clearly shown to exist and any doubt should be resolved in favor of the state's retaining jurisdiction. (*Davis v. Dept. of Labor & Industries, supra; Brotherhood of Railroad Trainmen et al v. Terminal Railroad Assn., supra; Parker, Dir. of Agriculture et al v. Brown, supra.*)

It is contended by appellant that the 1939 amendment to the Federal Employers' Liability Act, supra, broadened the act and brought within it employes not previously covered by establishing "two classifications, either one of which brings the employee within the provisions of the Federal Employers' Liability Act, (1) 'any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce,' or (2) when his duties shall 'in any way directly or closely and substantially, affect such commerce as above set forth.' " While there may be two classifications, the weakness of this contention lies in the fact that at the time respondent sustained the injury, and prior thereto, he was performing no duties as an employee of appellant's in the furtherance of interstate or foreign commerce, nor did the duties he was performing in any way directly or closely

and substantially affect such commerce. The appellant itself was not engaged at the time of the injury, and prior and subsequent thereto, in the furtherance of interstate or foreign transportation in or over the entire area where the new construction was being carried on and which had been withdrawn from service.

A careful analysis of the many decisions cited in the briefs of counsel for both parties and other cases examined, and keeping in mind that each case must be decided in the light of its own peculiar facts, constrains us to hold that under the facts of this case, respondent was not engaged either in interstate or intrastate commerce at the time of his injury, and therefore cannot be classified as falling within the Federal Employers' Liability Act as amended. To hold that the amendment, under the facts of this case, applies to respondent would sanction another unwarranted invasion by congress of the reserved power of the states over their local concerns.

Having so concluded it would follow that the Industrial Accident Board was not without jurisdiction, nor did it act in excess of its powers. The findings of fact by the board support the award.

The judgment is affirmed and it is so ordered with costs to respondent.

Givens and Dunlap, JJ., concur.

HOLDEN, C.J., dissenting.—For many years appellant, Union Pacific Railroad Company (hereinafter called company), has been engaged in both intra and interstate commerce, maintaining a yard at Nampa, Idaho, where eastbound and westbound trains are made up and also where trains are made up for several branches like the McCall, Murphy, Homedale, Payette and Middle Valley, P. & I. N. Road. July 16, 1941, respondent strained his back while employed by the company in the Nampa yard. April 30, 1943, he filed notice of injury and claim for compensation with the State Industrial Accident Board. May 6, 1943, he filed a petition for hearing such claim. June 5, 1943, the Company filed an answer, in which, among other things, the Company pleaded:

"Further answering said petition and as a second separate and distinct defense thereto, defendant (Company)

alleges that it is engaged in the operation of a line of railroad extending within and through the State of Idaho and is engaged in the business of transporting for hire persons and property in interstate and foreign commerce within and through said State of Idaho. That for a long time prior to, on, and since the 16th day of July, 1941 the defendant has been, was, and now is so engaged. That prior to, on, and subsequent to the 16th day of July, 1941 the said claimant Reuben Moser was employed by the defendant in the capacity of a track laborer. That his duties consisted of construction, maintenance and repair of defendant's tracks used in both intrastate and interstate commerce; that claimant's said duties as a track laborer were in furtherance of interstate commerce and directly, closely and substantially affected such commerce. Accordingly claimant's remedy, if any he has, is governed and controlled exclusively by the provisions of the Federal statute known as the Federal Employers' Liability Act and the Industrial Accident Board has no jurisdiction in the matter and possesses no power or authority to make an award to the claimant in this proceedings."

June 10, 1943, the matter was heard by the board. August 26, 1943, findings of fact and rulings of law were made and filed and an order entered thereon awarding compensation to respondent from which the Company appeals.

The Company, before the board and on this appeal, challenges the jurisdiction of the State Industrial Accident Board to hear and determine the controversy. On the other hand, respondent contended before the board and contends on this appeal, the board had jurisdiction to hear and determine his claim to compensation. The facts pertinent to a determination of the question of jurisdiction, briefly stated, are: that the business of the Company increased to a point where it became necessary to enlarge its yard located at Nampa, chiefly to enable the Company to relieve congestion in the yard due to interstate traffic moving over its line through the Nampa yard; that enlargement project was started May 27, 1941 and was completed July 19, 1941; that to enable the Company to expeditiously make up the long interstate trains coming into the yard it was necessary to, and the Company did, construct a new track about a mile and a half long—what the yardmaster called "a 115-car track"; that while traffic from certain branch lines running into Nampa (some of which was intrastate and some inter-

state) would benefit by such enlargement and improvement, still and nevertheless, the principal traffic to be affected was the through, or interstate, traffic of the Company; that the construction of the new track and the construction of an ice dock (included in the enlargement project) required the relocation, relaying and shifting of old tracks, switches and other facilities; that shortly after the work of the enlargement of the Nampa yard began, to-wit, June 2, 1941, respondent was employed and put to work in what is called in the record, an "extra gang"; an extra gang is simply a larger gang than a regular section gang; an extra gang, like a regular section gang, engages in maintenance and repair work on existing tracks; while respondent was standing in the middle of the new track, shoveling gravel, he strained his back; the gravel used in the construction of the new track and being shoveled by respondent, was loaded at Claytonia, Idaho, a point on the Homedale branch, and shipped from that point through Nyssa, Oregon, and then on to the yard at Nampa; that thus the track upon which respondent was working was actually being used in interstate commerce; that from June 2nd to July 16th, 1941, respondent was assisting in work over the *entire* yard and while the new track was closed to all traffic but the interstate "gravel" traffic above mentioned, the rest of the yard was continuously used as always in interstate traffic; that:

"Q. Let me ask you this. You (respondent) were working on the tracks, maintaining and repairing tracks—doing anything the foreman told you to do? That is correct, isn't it?

"A. Yes.

"Q. And when he (the foreman) told you that you would have to shift this existing yard track (an old yard track) you proceeded with the rest of the men, didn't you?

"A. Yes.

"Q. Anything he (foreman) directs you to do is part of your duties is it not * * *

"A. I did all the work that he asked me to do."

That respondent, prior to his injury (as he also testified), was shifted or "went from one track to the next."

A determination of the question as to whether the State Industrial Accident Board has jurisdiction to hear and determine respondent's claim to compensation, requires con-

sideration and interpretation of the Federal Employers' Liability Act, after amendment. Hence, we first turn to the following pertinent parts of Sec. 1 of the original Federal Employers' Liability Act:

"Every common carrier by railroad while engaging in commerce between any of the several states or territories, or between any of the states and territories, or between the District of Columbia and any of the states and territories, or between the District of Columbia or any of the states or territories and any foreign nation or nations, shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, * * *"

Before its amendment, in *Shanks v. Delaware, L. & W. R. Co.*, 239 U.S. 556, 60 L. Ed. 437 (decided in January, 1916), the Supreme Court of the United States construed that section. In that case, the facts, as stated by the court, were:

"The railroad company was engaged in both interstate and intrastate transportation, and was conducting an extensive machine shop for repairing parts of locomotives used in such transportation. While employed in this shop, Shanks was injured through the negligence of the company. Usually his work consisted in repairing certain parts of locomotives, but on the day of the injury he was engaged solely in taking down and putting into a new location an overhead countershaft—a heavy shop fixture—through which power was communicated to some of the machinery used in the repair work."

Having stated the facts, the court continued:

"The question for decision is, was Shanks *at the time of the injury* employed in interstate commerce within the meaning of the employers' liability act? What his employment was on other occasions is immaterial, for, as before indicated, the act refers to the service being rendered when the injury was suffered.

"Having in mind the nature and usual course of the business to which the act relates and the evident purpose of congress in adopting the act, we think it speaks of interstate commerce, not in a technical legal sense, but in a practical one better suited to the occasion (citing cases), and that the true test of employment in such commerce in the sense intended is was the employee, *at the time of the*

*injury,* engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?" (Emphasis mine.)

Under the rule announced in the Shanks case, supra, it was often difficult to determine whether an employee *at the time of the accident* was actually engaged in intrastate or interstate commerce. For over thirty years there was much uncertainty and confusion. It was very difficult in many instances for an injured employee to determine his status, with consequent failures of justice. Finally, some thirty years after the enactment of the original above quoted statute, the congress, for the purpose of remedying that fault, amended the statute and broadened "the scope of the Employers' Liability Act (1939 amendment, sec. 51, 45 U.S.C.A., p. 118) *so as to include within its provisions employees* of common carriers who, while ordinarily engaged in the transportation of interstate commerce may be *at the time of the injury* (emphasis mine) temporarily divorced therefrom and engaged in intrastate commerce." (*McFadden v. Pennsylvania R. Co.* (N.J.) 34 A. (2d) 221, 222.) The amendment (1939 supra) provides:

"Any employee of a carrier, *any part of whose duties as such employee shall be the furtherance of interstate or foreign commerce; or shall, in any way directly or closely and substantially, affect such commerce* as above set forth shall, for the purposes of this chapter, be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter." (Emphasis mine.)

The first case decided after the adoption of the amendment was *Ermin v. Pennsylvania R. Co.,* 36 F. Supp. 936. It appears that:

"On January 12, 1940 (the date of Ermin's injury), the plaintiff (Ermin) was engaged as brakeman in moving defendant's engines, which had been out of service for repairs for several months, from its Altoona yard to its Hollidaysburg yard, where they were to be held until orders should be given to take them to Altoona to be repaired; after which repairs they would be returned to service * * *

"These engines were being moved for the purpose of being repaired and returned to active service in their divisions, * * *"

The court said:

"This case involves the construction of the Federal Employers' Liability Act as amended by the Act of Congress, approved August 11, 1939.

"The discussions in Congress indicate that it was the intent of the lawmakers to bring within the scope of the Federal Employers' Liability Act all employees whose work at the time of injury was not in actual interstate transportation or a part of it, *but any part* of whose work was in *furtherance of interstate commerce, or in any way affected* such commerce directly, closely and substantially. The bill, as introduced in the Senate, provided that an employee was to be considered as engaged in interstate commerce if his duties 'in any way' affected interstate commerce. At one of the hearings before a sub-committee of the Committee on the Judiciary of the Senate, the Committee, at the suggestion of Senator Austin, amended this provision by substituting the words 'or in any way directly, or closely and substantially affect such commerce.' Senator Austin said: 'Now, on page 2, lines 18 and 19, occur the words "or in any way." Unless I am convinced I ought not to do that for some good reason, I think I will move to substitute for those words that occur and recur in many cases of recent date as defining what kind of effect on interstate is comprehended by the commerce clause of the constitution. Those are the words, "directly, closely and substantially." I would substitute those words for the words "or in any way" ' ".

"And again: 'Senator Austin: My amendment was to substitute for the words "or in any way" the words "directly, closely and substantially." That is the law as it is interpreted by the Supreme Court of the United States in National Labor Relations Board against Jones & Laughlin Steel Corporation [301 U.S. 1, 57 S. Ct. 615, 81 L. Ed. 893, 108 A.L.R. 1352]; in the Bituminous Coal Conservation Act of 1935, in connection with N.R.A. Codes, and in *Carter v. Carter Coal Co.*, and others [298 U.S. 238, 56 S. Ct. 855, 80 L. Ed. 1160].' "

"It developed at many of the trials of actions brought by railroad employees that they were not informed by the railroad whether or not at the time of the accident they were actually engaged in interstate commerce, and as a matter of fact few of them knew at the moment when the accident occurred whether they were engaged in interstate or intrastate commerce.

"There are multitudinous decisions raising hair-splitting interpretations as to whether or not the employee at the *time* of his accident was actually engaged in interstate commerce. *It was to avoid this difficulty that congress enacted the amendment.* It was, undoubtedly, the intent of congress to include within the scope of the Federal Employers' Liability Act all employees, even those performing intrastate services whose employment meets the requirements of the Act. It is no longer subject to doubt that congress had the power to include intrastate employment, which affects interstate commerce, within the scope of the Federal Employers' Liability Act. (Citing cases.)

*"The court should not by a strained construction* (as in the majority opinion in the case at bar) *override the intent of the congress* but should rather decide questions in accordance with the views expressed by the congress. *Here the congress was trying to remedy a fault, it was enacting legislation which would not require a railroad employee to draw a hairline to determine whether or not at the moment of the accident he was actually engaged in interstate commerce. The congress was correcting an evil which existed which prevented railroad employees from receiving a just determination of their rights."* (Emphasis mine.)

In *Wright v. New York Cent. R. Co.,* 33 N.Y.S. (2d) 531, the court said:

"Claimant usually worked in intrastate commerce for five days a week and in interstate commerce for one day a week. On November 22, 1939, when injured, he was engaged in intrastate commerce.

"Previous to August 11, 1939, the nature of the work in which an interstate carrier's employee was engaged at the *time* of his injury or death determined whether the Federal Employers' Liability Act, 45 U.S.C.A., sec. 51 et seq., applied and he was entitled to its benefits. (*Shanks v. Delaware, L. & W. R.R.,* 239 U.S. 556, 36 S. Ct. 188, 60 L. Ed. 436, L.R.A. 1916C, 797.) And there were many borderline decisions under this rule. *A case would turn upon some slight differentiation in duty or operation, more apparent than real. There was much hair-splitting and little certainty. It was to avoid all this and to give a fixity of application that congress amended this act on August 11, 1939, to include 'any employee of a carrier, any part of whose duties as such employee shall be the furtherance of inter-*

*state or foreign commerce'. Thus the scope of the statute was broadened so as to include practically all employees of interstate carriers,* including such employees as this claimant, and to do away with the borderline cases. Fine distinctions are no longer necessary. *The act is now all inclusive and made so purposely.* The language *'any part of whose duties'* is almost as broad as words can make it and *we should apply it in the spirit in which it is written.* Because of this *new* statute the State Industrial Board had no jurisdiction of this claim." (Emphasis mine.)

In *Lewis v. Industrial Accident Commission et al.* (Supreme Court of California), 120 P. (2d) 886, the court pointed out:

"*In order to effectuate the purposes of the amended federal statute and to avoid the hardship involved in determining in each case whether the federal or state remedy is to be applied, all doubts should be resolved in favor of the federal jurisdiction.*" (Emphasis mine.)

*Agostino v. Pennsylvania R. Co.,* 50 F. Supp. 726, in its facts (pertinent in the instant case), is identically like the case at bar. The Conemaugh Division of that railroad (engaged like the Union Pacific in both inter and intrastate commerce) consisted of one eastbound and one westbound track. For many years a portion of the tracks of the Conemaugh Division ran parallel to the Conemaugh River. In order to shorten a portion of the tracks, reduce grades, eliminate curves and slides, and effect more efficient transportation of freight in interstate and intrastate commerce, the Pennsylvania Railroad undertook a project known as the East of Blairsville Revision of Track Alignment, which consisted of the construction of roadbed and track approximately 8,000 feet in length (about the length of the new Union Pacific track) to be connected at both ends with existing tracks. The work of laying tracks began December 16, 1940. Agostino was injured December 31, 1940, while spreading cinders (in the case at bar Moser was injured while shoveling or spreading gravel in the course of the construction of the new track by the Union Pacific). At the time of the accident Agostino was working on the final stage of the completion of the track revision, just as Moser was working on the final stage of the completion of the new track by the Union Pacific, when he strained his back. Neither road intended its new construction to be independent of existing facilities used in interstate and

intrastate commerce. On the contrary, each road intended its new construction to be simply an improvement of existing facilities for handling interstate and intrastate commerce. Furthermore, each road later connected its new tracks with existing tracks used in both interstate and intrastate commerce. The court said:

"Was the plaintiff's work in 'furtherance' of interstate commerce? Did it 'in any way' further or 'affect' interstate commerce? Can it be said that the plaintiff's work was not 'in any way' in 'furtherance' of interstate commerce? Did it not substantially 'affect' such commerce.

"The court is not required here to determine whether a person engaged in erecting a new project, intended to be used in interstate commerce, was engaged in interstate commerce, nor to determine whether or not a person working on a new project, such as the construction of a new railway, passenger station or freight house intended to be used in interstate commerce, is actually engaged in interstate commerce.

"Here the plaintiff was working on a revision of track alignment which was an improvement of the existing highway of interstate commerce. Was not that 'in any way' in 'furtherance' of interstate commerce? Does that not 'affect' such commerce? It was just as important to place rails as to replace rails on existing tracks.

"The conclusion seems inescapable that the construction work, while new, was only an improvement such as an extension, alteration, replacement or repair and, therefore, the plaintiff was engaged in interstate commerce."

In the majority opinion it is stated that to determine whether or not the State Industrial Accident Board has jurisdiction, "we must determine" whether Moser was, "at the *time* of the injury" (emphasis mine) "engaged in interstate or intrastate commerce." And further on in the majority opinion, it is stated it is clearly established that "at the *time* (again the emphasis is mine) respondent (Moser) sustained the injury, he was engaged in new construction." In other words, the majority holds that because Moser at the *time* or moment, he sustained his injury, was shoveling and spreading gravel on the new track, he was employed in intrastate commerce. And to support that holding a line of authorities is cited, among them, *Hulse v. Pacific etc. Ry. Co.*, 47 Ida. 561, decided some ten years before the

enactment of the above quoted amendment of the Federal Employers' Liability Act. In the Hulse case, supra, this court properly followed the rule announced in *Shanks v. Delaware, L. & W. R. Co.*, supra, but that rule was announced long before the adoption of said amendment. Neither the purpose and intent of the congress in the enactment of the amendment, nor the effect of the amendment, could have been presented to this court in the Hulse case because the amendment had not then been made. Still and nevertheless, the majority, in determining the question of jurisdiction presented in the instant case, applies the old test applicable before the congress adopted the above quoted amendment, thus nullifying the sound, salutary provisions of such amendment.

The order appealed from should be reversed and the cause remanded with direction to the Industrial Accident Board to dismiss the proceeding.

AILSHIE, J.—No question is raised here about the sufficiency of the evidence to support the findings of the State Industrial Accident Board, as to the facts of this case. We are therefore bound to accept the findings as a correct statement of the essential facts upon which the board made its order. (*Bower v. Smith*, 63 Ida. 128, 118 P. (2d) 737, and cases cited; Sec. 43-1413, I.C.A., as amended, '37 Sess. Laws, chap. 175, p. 290.) For that reason, I am incorporating herein the findings relative to the nature of the work at which respondent was engaged when the accident occurred; they are as follows:

"V.

"That due to the increase in both interstate and intrastate transportation by rail, to facilitate the making up and switching of its trains, to relieve the congestion of traffic in the yard at Nampa, Canyon County, Idaho, and generally to increase the efficiency of its operations, the said defendant, during the month of April, 1941, caused plans to be prepared by its chief engineer for a rearrangement and extension of the said Nampa yard, providing for the installation of new tracks, switches and other facilities, the taking up or replacing, relocating and relaying of old tracks, switches and other facilities, and in general a plan of construction and reconstruction to enlarge said yard. That said project called for the excavating for and construction

of approximately four miles of new tracks and thirty-two new switches, the building of a new large icing dock about 900 feet long, and the relocating of tracks and switches to make room for the new icing dock.

## VI.

"That pursuant to said plan, construction on said project was started May 27, 1941. From the commencement of construction to July 19, 1941, the part of the yard under construction and reconstruction, 'the new part,' was closed to traffic and was not kept in service, although connected by switches, with the portion of the yard which was kept in service. On said last mentioned date the new and reconstructed portion of the yard was opened by traffic, but the project was not finished until about August 23 of the same year.

## VII.

"That said work was performed by a so-called 'extra-gang,' a crew ordinarily called out on new construction or as extra help on maintenance and repair jobs too large for a section crew. At the times herein involved the said extra-gang consisted of about 65 men and was in charge of a foreman.

"While engaged on the Nampa yard project, from time to time, the defendant sent a few members of the extra-gang to work outside the project on branch lines within the State of Idaho, once to the McCall branch with a tie gang and three times to go on the Murphy branch; although claimant was not so employed outside the project until some time *in August,* 1941, *after his injury,* when he was sent on fire patrol to the McCall branch.

## VIII.

"That claimant was employed on said extra-gang as a laborer on said project from *June* 2, 1941, *to June* 16, 1941. That for the first four or five days he was assigned and performed work assisting in *relocating tracks* which were moved to make room for the new *icing dock.* Thereafter he was assigned and performed work in the constructing of a new yard track, about one mile in length, known under the project as Track No. 118, with the exception of a short time in the morning of June 16, when, at the direction of his foreman, he used his automobile to take the foreman and another boss to town. That claimant's work on such

track consisted in helping to carry and lay ties and rails and align them, and to shovel and level gravel. That said gravel had been procured by defendant at its gravel pit at *Claytonia, Idaho, brought by work train over its Homedale, Idaho, branch, via Nyssa, Oregon,* to Nampa, Idaho, where the gravel cars were pushed and backed into the yard by a yard engine and dumped between the rails and on the track aforesaid.

## IX.

"That on July 16th, 1941, upon claimant's return from town as aforesaid, he commenced leveling and shoveling gravel from between the rails on Track No. 118, using a short-handled scoop-shovel, by means of which he was throwing the gravel, some ten feet to his right, into a barrow pit; that after so throwing some ten to fifteen shovelsful, while throwing another shovelful he twisted himself, and, as he swung back into position, his back weakened or 'something happened' to his back, resulting in a severe pain from which he collapsed and fell in a fainting condition between the tracks.

## X.

"That as a result of said injury claimant was totally disabled for work from the date of said accident, July 16, 1941, to October 1, 1942, except for a brief period of ten days in August 1941, when he was employed by defendant upon what turned out to be a mistaken assumption by both parties that he was then able to perform light work." (Italics inserted.)

It seems clear from the findings, that respondent at the time of his injury was engaged in work for the railroad company in the "furtherance of interstate or foreign commerce" and likewise and, at the same time, *in furtherance of intrastate commerce.* It seems to me that the work at which respondent was engaged, as recited in the findings, did and does in a "way directly or closely and substantially affect" *interstate commerce.* The purpose of the amendment of August 11, 1939, (45 U.S.C.A., sec. 51), in this respect, is very succinctly and tersely stated by the House Conference Committee in their reports to the House, after conference with the Senate conferees over differences that had arisen between the members of the two branches of Congress as to how the amendment should be worded. After

stating to the House the result of the conference, the Committee explained the intention of the amendment as follows:

·"The conferees agreed to a Senate provision, not contained in the House amendment, which is intended to broaden the scope of the Employers' Liability Act so as to include within its provisions employees of common carriers who, while ordinarily engaged in the transportation of interstate commerce, may be, at the time of injury, temporarily divorced therefrom and engaged in intrastate operations.

"The question whether an employee, at the time of his injury, is engaged in interstate or intrastate commerce is frequently difficult of determination. Under the rule laid down by the Supreme Court of the United States, an employee of a railroad company who may be injured must be found to have been engaged, at the time of the infliction of the injury, 'in transportation or work so closely related to it as to be practically a part of it' (*Shanks v. D., L. & W. R. R.*)."

(76th Congress, First Sess., vol. 84, pt. 10, p. 11107.)

The cases decided under the 1939 amendment all hold the view, that the purpose of the amendment was to bring all workmen within the operation of the Federal Employers' Liability Act, whose work "in any way directly or closely and substantially" affects interstate commerce. The cases involving the amendment are collated in *Agostino v. Pa. R. Co.*, 50 F. Supp. 726. Subsequent decisions not cited in the Agostino case are: *Prader v. Pa. R. Co.*, 49 N.E. (2d) 387, 391; *McFadden v. Pa. R. Co.*, 130 N.J.L. 601, 605, 34 Atl. (2d) 221, 223.

Here the employee's work was "in furtherance of interstate or foreign commerce" and "directly or closely and substantially" affects such commerce.

There is one recent case, however, that disturbs me somewhat. It is *Davis v. Dept. of Labor, etc., of Washington*, 317 U.S. 249, 63 S. Ct. 225, 229, 87 L. ed. 175, (Petn. for rehearing denied, Jan. 11, 1943, 317 U.S. 713, 63 S. Ct. 438, 87 L. ed. 405). While that case involves the consideration and application of the Federal Longshoremen's and Harbor Worker's Act, 33 U.S.C.A., sec. 901 et seq., its determination seems to have turned on the issue of jurisdiction—whether it is state or federal. So, the reasoning and logic of the

opinion in that case seems as applicable here as it was there. In the majority opinion in that case, it is said:

"There is, in the light of the cases referred to, clearly a twilight zone in which the employees must have their rights determined case by case, and in which particular facts and circumstances are vital elements. That zone includes persons such as the decedent who are, as a matter of actual administration, in fact protected under the state compensation act."

Further on the writer (Mr. Justice Black) said:

"In such a case involving the question of whether the California or the Alaska Workmen's Compensation Act should apply to a resident of California injured in Alaska who brought suit in California, this court has said: 'The enactment of the present statute of California was within state power and infringes no constitutional provision. Prima facie, every state is entitled to enforce in its own courts its own statutes, lawfully enacted.' . . . Not only does the state act in the instant case appear to cover this employee, aside from the constitutional consideration, but no conflicting process of administration is apparent. The federal authorities have taken no action under Longshoremen's Act, and it does not appear that the employer has either made the special payments required or controverted payment in the manner prescribed in the Act."

Mr. Justice Frankfurter seems to have understood the majority opinion as *conferring jurisdiction on either the state or federal authorities* according to which one first assumed jurisdiction. He says:

"Theoretic illogic is inevitable so long as the employee in a situation like the present *is permitted to recover either under the federal act* [authorities cited] *or under a state statute* [authorities cited]. That is the practical result, whether it be reached by the court's path or that apparently left open under the Chief Justice's views." (Italics supplied.)

Addressing himself to the same subject, the Chief Justice said:

"The proposition that an employee in a 'twilight zone' (where it is doubtful whether the federal or a state act applies) *can recover under either act*, not only controverts the words of the statute but also imposes an unauthorized

burden on the employer. Besides being subjected to a liability which the statute forbids, he is compelled, in order to protect himself in the large number of cases in which the court apparently would allow recovery under either act, to comply with both. . . . *The dual system of presumptions, which are to operate in favor of the employee but apparently never against him, will serve to sustain an exercise of either state or federal jurisdiction in every case within the so-called 'twilight zone.' "* (Italics supplied.)

Here the employee chose to invoke the state jurisdiction, under a valid state statute, presumably (judging from the findings of fact), because of inability to prove *negligence of the employer,* which is unnecessary under state Compensation Act. (*Olson v. U. P. R. Co.,* 62 Ida. 423, 428, 112 P. (2d) 1005, and cases cited.) Consequently, if negligence can not be shown, lack of jurisdiction on the part of the State Industrial Accident Board would in this case leave the employee without any relief under *either the state or federal statute.*

Notwithstanding these misgivings arising out of the opinions in the Davis case, I am inclined to the belief, that this case is covered by the amendment (45 U.S.C.A., 51) ; and that the State Industrial Accident Board was without jurisdiction to make the order complained of.